## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIM YEN NEE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FITNESS CHAMPS HOLDINGS LTD, JOYCE LEE JUE HUI, KOH YONG MONG, TEOH SIEW THIM, BANCROFT CAPITAL, LLC, ONESTOP ASSURANCE PAC, and JOHN DOES 1-100,<br><br>Defendants. | Case No: 1:26-cv-3182<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Lim Yen Nee ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Fitness Champs Holdings Ltd. ("FCHL" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by FCHL; and (c) review of other publicly available information concerning FCHL and similar entities.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired FCHL securities between September 3, 2025, and September 23, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against FCHL, its executives Joyce Lee Jue Hui, Koh Yong Mong, Teoh Siew Thim, Bancroft Capital LLC, and Onestop Assurance PAC, as well as unidentified John Does 1-100, (the "Defendants"), under the Securities Exchange Act of 1934.

2.    The Company conducts its purported business operations in Singapore through two wholly owned subsidiaries: Fitness Champs PTE LTD and Fitness Champs Aquatics PTE LTD. FCHL purports on its website to be "a distinguished sports education provider, playing a pivotal role in shaping the aquatic landscape in Singapore." The Company's group structure also includes the wholly owned subsidiary Northern Star Limited, incorporated in the British Virgin Islands, which holds all 10,000 issued shares of Fitness Champs PTE LTD and all 1,000 issued shares of Fitness Champs Aquatics PTE LTD.

3.    The Company is a holding company incorporated in the Cayman Islands. FCHL's principal executive offices are located at 7030 Ang Mo Kio, Avenue 5, No. 04-48,

1

NorthStar@AMK, Singapore 569880. The Company completed its initial public offering on September 4, 2025, selling 2M ordinary shares at offering price of $4.00 per share, raising $8M in gross proceeds (the "IPO").

4.      This case arises from the sudden collapse of FCHL's stock price on September 23, 2025, due to a fraudulent market manipulation scheme that caused the Company's stock price to trade as high $7.20 per share on September 19, 2025, despite no fundamental news to justify such a spike in the Company's stock price. Investigation and public reports have revealed that FCHL was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. Impersonators acting as financial advisors touted FCHL in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

5.      On September 23, 2025, the Company's stock price collapsed 84.6% to close at $1.07 per share, down from $6.95 per share on September 22.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) FCHL was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) FCHL's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) as a result, FCHL securities were at unique risk of a sustained suspension in trading by NASDAQ and severe volatility-induced decline; (4) the sole underwriter on the IPO, Bancroft (defined below), had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; and (5) as a result of the foregoing, Defendants'

positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## II.    JURISDICTION AND VENUE

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. The Company's agent of service and authorized U.S. Representative, Cogency Global Inc., is located in this District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

11.    Plaintiff Lim Yen Nee, as set forth in the accompanying certification, incorporated by reference herein, purchased FCHL securities during the Class Period, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

3

12.    Defendant FCHL is a Cayman Islands incorporated holding company with principal executive offices in Singapore. The Company's common stock trades on the NASDAQ under the symbol "FCHL" during the Class Period.

13.    Defendant Joyce Lee Jue Hui ("Lee") is and was the Company's Chief Executive Officer and Executive Director at all relevant times.

14.    Defendant Koh Yong Mong ("Koh") is and was the Company's Chief Operating Officer and Executive Director at all relevant times. Defendant Koh is also the husband of Defendant Lee.

15.    Defendant Teoh Siew Thim ("Teoh") was the Company's Chief Financial Officer at all relevant times.

16.    Defendant Onestop Assurance PAC ("Onestop" or the "Auditor Defendant") has served as the Company's auditor since 2023 and is headquartered in Singapore.

17.    Defendant Bancroft Capital LLC ("Bancroft" or the "Underwriter Defendant") served as the Company's underwriter in connection with the IPO. Bancroft is headquartered in Fort Washington, Pennsylvania and is a Pennsylvania corporation.

18.    Defendants John Does 1-100 are co-conspirators in the market manipulation scheme, whose true identities can only be ascertained following discovery, but may include and are not limited to members of the so-called "Syndicate" as referred to in the SEC's court filings in *Peiyong v. U.S. Securities and Exchange Commission,* Case No. 1:25-mc-000350 (S.D.N.Y.) (ECF No. 7), as well as stock promoters using social media and messaging applications, and additional, unidentified underwriters involved in the stock manipulation scheme.

19.    Defendants Lee, Koh, and Teoh (collectively, the Individual Defendants), because of their positions within the Company, possessed the power and authority to control the contents

4

of the Company's reports to the SEC, press releases, and presentations to the market. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their respective positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representation which was being made was then materially false and/or misleading. The Individual Defendants are liable for the false statement pleaded herein.

20.    The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's September 4, 2025, IPO. Additionally, Defendant Onestop was FCHL's auditor throughout and for years prior to the Class Period and had access to material non-public information. Because of its position, Onestop knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Defendant Onestop had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

21.    The Underwriter Defendant was identified as the sole bookrunning manager on the IPO in the Company's Prospectus (defined below), the sole representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement") and agreed to conduct the IPO on a firm commitment basis. The

Underwriter Defendant, based on its position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. With this authority and by acting as sole book-runner and representative for the underwriters, Plaintiff and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter Defendant and accordingly, the Underwriter Defendant is also liable for the false statements and omissions pleaded herein.

22.     The Underwriter Defendant has been involved in at least seven other microcap initial public offerings since January 2024, which have been similarly disastrous for investors. Bancroft served as: (1) the sole lead underwriter in connection with the July 2024 Primega Group Holdings (now DirectBooking Technology Co., Ltd.) initial public offering, which has collapsed approximately 98.4% from its highest closing price in October 2024; (2) the sole underwriter in connection with the September 2024 Premium Catering (Holdings) Ltd., initial public offering, which was halted from trading by the SEC from October 17, 2025 through October 30, 2025, and then halted by NASDAQ starting on October 31, 2025, and remains halted through present day; (3) the sole underwriter in connection with October 2024 SKK Holdings Limited initial public offering, which traded as high as $11.45 per share on November 18, 2024, before closing at $1.84 per share on that same day and is now trading for mere pennies per share; (4) the lead underwriter on the January 2025 Hong Kong Pharma (now named Cellyan Biotechnology, Co. Ltd.) initial public offering, which now trades at approximately $0.64 and during a day of substantial decline experienced trading volume of 157M on just 1.4M shares publicly outstanding, indicating excessive volatility and potential manipulation in the stock; (5) the representative of underwriters on the February 2025 TEN Holdings Inc., initial public offering, which surged to over $90.00 per share on the IPO, but suffered a steep decline thereafter and now trades at just $1.53 per share; (6)

the sole underwriter on the August 2025 Magnitude International Ltd., initial public offering, which was suspended from trading by the SEC from December 5, 2025 to December 18, 2025 and subsequently, halted from trading by NASDAQ from December 19, 2025, through the date of this filing; and (7) the lead managing underwriter and book-runner on the October 2025 Republic Power Group Limited initial public offering, which surged on the IPO up to $99.60 per share and following a substantial decline now trades below $1.00 per share.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Material Misstatements and Omissions Are Contained in FCHL's Registration Statement and Prospectus

23.     The Class Period begins on September 4, 2025, when the Company filed its IPO Prospectus permitting FCHL to issue 2,000,000 shares with selling shareholders selling 1,750,000 shares at an initial offering price of $4.00 per share for a total capital raise of $8M (the "Prospectus"). In the Prospectus dated September 4, 2025, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement"), the Company described its business as follows:

> **Our Mission**
>
> Our mission is to make swimming an affordable sport for all by offering comprehensive swimming lessons and teaching swimming skills and techniques to our students and to encourage the public to use swimming as a healthy and fun sport for all ages.
>
> **Overview**
>
> We believe we are a leading sports education provider in Singapore, specializing in the provision of swimming programs to students, with more than 240 certified swim coaches as of the date of this prospectus, and based on the following: (i) in 2023, we were the largest service provider of the SwimSafer Program based on the number of assessment bookings, *accounting for approximately 30% of market share;* and (ii) we are one of the few swim education providers in Singapore that provides both services to students under training programs funded by the Singapore Government and

7

provision of customized private swimming training services. We offer general swimming lessons to children and adults, with ladies-only swimming lessons available, as well as aquatic sports classes such as water polo, competitive swimming and lifesaving. We believe in imparting the correct swim stroke techniques and skills to all of our students so that they can learn to swim within the shortest time span in a variety of strokes, ranging from freestyle, breaststroke, butterfly, survival backstroke and side kick. We are one of the largest providers of swimming lessons to children enrolled in public schools under the MOE in Singapore through the SwimSafer program, and have been offering private swimming lessons to children, youths and adults under our brand "Fitness Champs" since 2012. We aim to make swimming an enjoyable and affordable sport for children and adults, for water safety and as a way of keeping fit and healthy. We also plan to enter into other sports including pickleball, targeting to be a diversified sports education provider.

**Competitive Strengths**

We have an established track record and brand awareness in providing swimming lessons in Singapore.

We have strong and stable relationships with a large network of swim coaches in Singapore.

We are able to offer a stable stream of school-based swimming lessons in Singapore, which enables to attract more swim coaches and students.

We are one of five swimming schools who are engaged by the MOE to provide swimming lessons to students who are enrolled in public schools in Singapore under the SwimSafer initiative spearheaded by the Singapore Government.

(emphasis added).

24.     The Prospectus also contained consolidated balance sheets for fiscal years 2023 and 2024, as well as the accompanying Report of Independent Registered Public Accounting Firm signed by Defendant Onestop regarding the financial results of 2023 and 2024. Specifically, Defendant Onestop reported the following:

**Opinion on the consolidated financial statements**

8

We have audited the accompanying consolidated balance sheets of Fitness Champs Holdings Limited and its Subsidiaries (collectively referred to as the "Company") as of December 31, 2024 and 2023, and the related consolidated statements of operations and comprehensive income, changes in shareholders equity and cash flows for each of the years in the three-year period ended December 31, 2024 and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2024 and 2023 and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public

Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as

9

evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

25.    The Prospectus also provided information regarding the Company's purported "Competitive Strengths[,]" which included the following:

**OUR COMPETITIVE STRENGTHS**

Our Directors believe that we have the ability to compete effectively against our competitors with the following competitive strengths:

We have an established track record and brand awareness in providing swimming lessons in Singapore.

We have operated since 2012 and have been enhancing our market presence in Singapore. We believe that our established reputation will enable us to compete effectively against the existing and potential competitors. We seek to strengthen our market position by increasing awareness and recognition our brand, "Fitness Champs" through increased market efforts.

**We have strong and stable relationships with a large network of swim coaches in Singapore.**

We enjoy strong and stable relationships with a large network of more than 240 swim coaches certified to provide swimming lessons in Singapore, and that we engage to provide swimming lessons to the school-based swim program and private swim lessons. Most of our swim coaches have been working with us for several years, with a good track record.

We believe that our engagement and relationships with our pool of more than 240 swim coaches place us in a position to offer more swimming lessons and aquatic sports classes in Singapore. We treat our swim coaches as an invaluable resource and we are committed to provide them with adequate training and development to support the vision and future growth of our business.

**We are able to offer a stable stream of school-based swimming lessons in Singapore that enables to attract more swim coaches and students.**

We are one of the few swimming schools engaged by the MOE to provide swimming lessons to students enrolled in Singapore public schools under the SwimSafer initiative spearheaded by the Singapore Government. This provides a stable base of recurring swimming classes and students for our swim coaches.

10

In addition, our reach in coaching a large number of students from our school-based program enables us to obtain referrals from students who wish to take up private swimming lessons and aquatic sports classes with us as well. As a result, we are able to achieve a critical mass of students and our swimming coaches are able to conduct regular swim classes.

**Our founder and Executive Director has extensive experience in the industry and is supported by a dedicated management team.**

We have a dedicated management team spearheading our business operations and driving our future growth plans. Our management team is led by our founder and Executive Director, Ms. Lee, who is a certified swim coach herself and has developed a reputation and strong track record with over 20 years in this industry.

26.    The Prospectus also addressed the Company's purported "Business Strategies and Future Plans[,]" stating as follows:

**BUSINESS STRATEGIES AND FUTURE PLANS**

Our principal objective is to sustain continuous growth in our business and strengthen our market position in providing swimming lessons and aquatic sports by implementing the following business strategies and plans:

**Geographical expansion into new markets in the region**

As of the date of this prospectus, we provide swimming classes and aquatic sports classes within Singapore only.

We believe that with our established presence and our successful business model offering a structured swimming program in Singapore, there is potential to develop our business outside Singapore as other neighboring countries may not have similar structured program for swimming lessons and aquatic sports. We have identified Malaysia as an immediate potential market for our future business expansion.

**Expansion of our business through acquisitions, joint ventures and/or strategic alliances**

Leveraging our existing experiences and customer network, we plan to concentrate on expanding our business in Singapore as and when the opportunity arises. We plan to achieve such expansion through organic growth, and will consider suitable acquisitions, investments, strategic alliances and joint ventures to the extent such opportunities

11

are seen to help us develop new business and gain entry to new markets. This has the potential to bring about economies of scale and spur growth.

As of the date of this prospectus, we are not engaged in any form of discussions with any party to acquire its business or form joint ventures or strategic alliances. We believe that our status as a listed company will position us to take advantage of any such opportunities that may arise. Should such opportunities arise, we intend to finance such acquisitions, joint ventures and/or strategic alliances through bank borrowings, internally generated funds and/or proceeds raised from future share placement or issuance, and we will seek approval, where necessary, from our shareholders as may be required by applicable laws and regulations.

27.    The Prospectus also included vague, boilerplate disclosures regarding risk factors that could hypothetically adversely affect the Company and its investors including the following:

**If we fail to implement and maintain an effective system of internal controls, we may be unable to accurately or timely report our results of operations or prevent fraud, and investor confidence and the market price of our Ordinary Shares may be materially and adversely affected.**

Prior to the completion of this offering, we have been a private company with limited accounting personnel. Furthermore, prior to the completion of this offering, our management has not performed an assessment of the effectiveness of our internal control over financial reporting, and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. Effective internal control over financial reporting is necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, is designed to prevent fraud.

Our failure to implement and maintain effective internal controls over financial reporting could result in errors in our financial statements that could result in a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of our ordinary shares.

Upon the completion of this offering, we will become a public company in the United States subject to the Sarbanes- Oxley Act of

12

2002. Section 404 of the Sarbanes-Oxley Act of 2002, or Section 404, will require that we include a report of management on our internal control over financial reporting in our annual report on Form 20-F. In addition, if we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting on an annual basis. Our management may conclude that our internal control over financial reporting is ineffective. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report that is qualified if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a burden on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify material weaknesses and deficiencies in our internal control over financial reporting. The Public Company Accounting Oversight Board, or PCAOB, has defined a material weakness as "a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim statements will not be prevented or detected on a timely basis."

In addition, if we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may be unable to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, we could suffer material misstatements in our financial statements and fail to meet our reporting obligations, which would likely cause investors to lose confidence in our reported financial information. This could, in turn, limit our access to capital markets, harm our results of operations and lead to a decline in the trading price of our ordinary shares. Additionally, ineffective internal control over financial reporting could exposes us to increased risk of fraud, misuse of corporate assets and legal actions under the United States securities laws and subject us to

13

potential delisting from Nasdaq, to regulatory investigations and to civil or criminal sanctions.

We currently lack personnel adequately trained in and have appropriate knowledge of U.S. GAAP and SEC reporting requirements to properly address complex U.S. GAAP accounting issues and related disclosures to fulfill U.S. GAAP and SEC financial reporting requirements, which could result in (i) our failure to maintain effective internal control over financial reporting, (ii) errors in our financial statements;(iii) failure to meet our reporting obligations; and (iv) loss of confidence by the investors in our financial information. We are implementing a number of measures to address this issue , such as(i) engaging an external consulting firm to assist us with our financial in U.S. GAAP; (ii) allocating resources to improve financial oversight function; (iii) introducing formal business performance review process, and preparing and reviewing the consolidated financial statements and related disclosures in accordance with U.S. GAAP and SEC reporting requirements; and (iv) providing our relevant finance staff with appropriate training in connection with the requirements of U.S.GAAP.

\*        \*        \*        \*        \*

***Certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company. We may experience similar volatility, which may make it difficult for prospective investors to assess the value of our Ordinary Shares.***

In addition to the risks addressed below in "— *The trading price of our Ordinary Shares may be volatile, which could result in substantial losses to investors*," our Ordinary Shares may be subject to extreme volatility that is seemingly unrelated to the underlying performance of our business. Recently, companies with comparable public floats and initial public offering sizes have experienced instances of extreme stock price run-ups followed by rapid price declines, and such stock price volatility was seemingly unrelated to the respective company's underlying performance. Although the specific cause of such volatility is unclear, our anticipated public float may amplify the impact the actions taken by a few shareholders have on the price of our Ordinary Shares, which may cause our Ordinary Share price to deviate, potentially significantly, from a price that better reflects the underlying performance of our business. Should our Ordinary Shares experience run-ups and declines that are seemingly unrelated to our actual or expected operating

14

performance and financial condition or prospects, prospective investors may have difficulty assessing the rapidly changing value of our Ordinary Shares. In addition, investors of our Ordinary Shares may experience losses, which may be material, if the price of our Ordinary Shares declines after this offering or if such investors purchase our Ordinary Shares prior to any price decline.

***The trading price of our Ordinary Share may be volatile, which could result in substantial losses to investors.***

The trading price of our Ordinary Shares may be subject to rapid and substantial volatility, which could make it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares and result in substantial losses to investors.

There have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with recent initial public offerings, especially among those with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Ordinary Shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance and financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.

The trading price of our Ordinary Shares may be volatile and could fluctuate widely due to factors beyond our control and for reasons that are unrelated to our actual or expected performance. In addition, if the trading volumes of our Ordinary Shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Ordinary Shares. This low volume of trades could also cause the price of our Ordinary Shares to fluctuate greatly. Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares.

In addition to market and industry factors, the price and trading volume for our Ordinary Shares may be highly volatile for factors specific to our own operations, including the following:

15

- fluctuations in our revenues, earnings and cash flow;

- changes in financial estimates by securities analysts;

- additions or departures of key personnel;

- release of lock-up or other transfer restrictions on our issued and outstanding equity securities or sales of additional equity securities; and

- potential litigation or regulatory investigations.

28.     With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the net proceeds:

> We expect to receive approximately US$6.08 million of net proceeds from this offering after deducting underwriting discounts and commissions of US$0.56million and estimated offering expenses of approximately US$1.36 million payable by us. We will not receive any proceeds from the sale of the Ordinary Shares by the Selling Shareholders or the Resale Shareholder.
>
> We currently intend to use net proceeds due to us from this offering in the following ways:
>
> *Expanding the coaching team* – We intend to use 35% of the net proceeds for the expansion of our team by hiring and training additional coaches.
>
> *Marketing and Branding* – We intend to use 15% of the net proceeds for brand building marketing and promotion activities.
>
> *Strategic Acquisitions* – We intend to use 10% of the net proceeds for strategic investments and/or joint ventures. As of the date of this prospectus, no targets or joint venture partners have been identified.
>
> *Business Development* – We intend to use 10% of the net proceeds for business development such as vertical expansion into other aquatic sports such as water polo and competitive swimming programs.
>
> ***Debt repayment – We intend to use approximately 10% of the net proceeds for the repayment of certain loans made from Ms. Lee (our controlling shareholder) to us in connection with the payment***

16

*of costs and expenses in connection with this offering and obtaining listing of our Ordinary Shares on the Nasdaq. As at the date of this prospectus, the amount due to Ms. Lee is approximately S$1,129,000and is repayable on the completion of this offering.*

*Working capital* – The balance of the net proceeds due to us for general working capital and corporate purposes.

The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have significant flexibility and discretion to apply the net proceeds of this offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this registration statement. We reserve the right to change the use of proceeds that we presently anticipate and describe herein.

To the extent that the net proceeds we receive from this offering are not immediately used for the above purposes, we intend to invest our net proceeds in short-term, interest-bearing bank deposits or debt instruments.

(emphasis added).

29.    The statements identified above in paragraphs 22 through 28 were and are false and misleading because the statements failed to disclose that: (1) FCHL was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) FCHL's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) as a result, FCHL securities were at unique risk of a sustained suspension in trading by NASDAQ and severe volatility-induced decline; (4) the sole underwriter on the IPO, Bancroft, had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

17

30.     Each of the Individual Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Defendant Bancroft as the "sole bookrunning manager" for the IPO and Bancroft was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F.1/A Registration Statement filed by the Company on September 4, 2025. The Underwriting Agreement expressly provides in pertinent part in Section (5)(a)(iv)(B) under the heading Covenants that:

> If at any time during the Prospectus Delivery Period there occurred or occurs an event or development the result of which such Issuer Free Writing Prospectus conflicted or would conflict with the information contained in the Registration Statement or any Prospectus or included or would include, when taken together with the Time of Sale Disclosure Package, an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances prevailing at that subsequent time, not misleading, the Company will promptly notify the Representative and will promptly amend or supplement, at its own expense, such Issuer Free Writing Prospectus to eliminate or correct such conflict, untrue statement or omission.

Accordingly, the Underwriter Defendant had the opportunity to review the Registration Statement and Prospectus publicly filed with the SEC.

## B.     The Company Conducts Its Low-Float IPO and Experiences Heavy Trading Volume

31.     The Company's micro-cap IPO left the Company and its investors susceptible to a market manipulation and a "pump-and-dump" scheme. By offering just 2 million shares to the public, co-conspirators may have benefitted from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement.

32. On May 17, 2024, FCHL first filed on Form F-1 a Draft Registration Statement, attempting to register Ordinary Shares for listing on Nasdaq. The SEC responded on June 13, 2024, requesting an amendment in which the Company gave more explanation as to how it was a "leading sports education provider in Singapore."

33. For the next several months, FCHL attempted registration through no less than seven separate amendments to the original Form F-1. The SEC finally issued a Notice of Effectiveness on March 31, 2025, but on May 19, 2025, the Company requested a withdrawal of its Registration Statement, representing that it did not intend to pursue an IPO at that time after all, and that no securities had been sold in connection with its now-effective Registration Statement.

34. That same day, the Company subsequently filed a new Form F-1, and then filed amendments to that new Form F-1 on May 30, 2025, and August 7, 2025. This Registration Statement, signed by the Individual Defendants, became effective on September 3, 2025.

35. On September 3, 2025, FCHL filed on Form 8-A 12(b) a registration statement, to register Ordinary Shares, par value $0.000005 per share to be listed on the Nasdaq Capital Market under the symbol FCHL. The September 3, 2025 Form 8-A 12(b) was signed by Defendant Lee.

36. With no other news or announcements to support it, the Company's stock price quickly began to climb on a significant surge in daily trading volume. Just a week after the IPO, on September 11, 2025, the stock reached a price of $5.24 with a trading volume of 8,000,000 – up from around 3,000,000 from the Company's IPO.

37. The upward trajectory of the Company's stock price and trading volume continued, reaching a Class Period high of $7.64 per share intraday and closing price of $7.20 on September 19, 2025, on trading volume of 13,000,000, a float-turnover ratio of 3.47, signifying extremely

19

high volatility. On this date, the Company stock was halted by NASDAQ from trading on a Limit-Up Limit-Down Trading Pause.

38. The Company's common stock price closed at $6.95 per share on September 22, 2025, the next trading day, on high trading volume of 6,440,000, a float turnover ratio of 1.72, once again signifying extreme volatility.

39. Despite these unusual developments in both trading volume and a halt indicating the materialized risk of manipulation, the Company and Individual Defendants were silent.

**C.    The Market Manipulation Scheme Drives the Stock Gains**

40. Although public filings and news were scarce regarding the Company even as both stock price and trading volume surged, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" FCHL led by stock promoters posing as financial advisors. Based on information and belief, these stock promoters, among the John Does 1-100 Defendants, used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding FCHL.

41. These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join a stock trading and tips "groups" on messaging applications. One such group was marketed as the "Diamond Investment Club" and marketed as a free investment guidance group powered by AI and advised by a "Professor Davis", as seen from the following WhatsApp transcript:

> 8/25, 9:45:39 PM] +13032176441 : This is what a friend should do.
>
> [19/8/25, 9:52:30 PM] +13032176441 : Tomorrow or Thursday, our team's founder, Professor Davis, will personally create a trading plan, targeting a 15–25% return within 5–10 trading days. Dear Madam, would
>
> you be interested? I estimate the probability of success is around 90%. I suggest you give it some consideration.

20

[19/8/25, 10:16:30 PM] J: My money is tied up with other stocks for long term investment. i hv no more margin to invest since i m holding on to Coin and MP <This message was edited>

[20/8/25, 8:55:00 PM] +13032176441 : Good morning, my dear lady. Yesterday truly left me exhausted.

[20/8/25, 8:59:03 PM] J: Hi Daniel

[20/8/25, 9:00:47 PM] J: Are we expecting more bad news?

[20/8/25, 9:02:29 PM] J: <attached: 00000122-PHOTO-2025-08-20-21-02-29.jpg>

[20/8/25, 9:03:00 PM] J: So we hv to sell Coin at a loss if it drops to $295?

[20/8/25, 9:03:59 PM] J: What's your role vs Sophia's? How is this Diamond Investment club free for members?

[20/8/25, 9:14:30 PM] +13032176441 : My dear lady, you don't need to worry. I've already developed a corresponding strategy regarding COIN. As for Sophia, she is my assistant.

[20/8/25, 9:15:59 PM] J: I see.. so what is the strategy? :)

[20/8/25, 9:17:54 PM] +13032176441 : Our team, the Diamond Club partners, has developed an AI-powered stock selection and trading system. It is currently in the testing phase, and we are recruiting free trial users to validate its performance in real trading and to help improve the system with real market data. In the next stage, the system will be launched as a paid app, available to the public

42.    Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. The promoter would also require the investor to send them screenshots of the trade when completed. For example, these messages from stock promoters included and were similar to the following transcript:

Investment Thesis

21

*Market Dominance: FCHL controls nearly 55% of the Singapore swimming education industry and is the undisputed market leader.*

*Monopoly Advantage: With such a high market share, FCHL enjoys near-monopoly pricing power, strong profitability, and minimal competitive pressure.*

Institutional Support: This IPO was led by several of Singapore's five largest financial institutions. The strong support from these institutions not only validates FCHL's value but also strengthens confidence in its post-IPO capital inflow.

[9/9/25, 9:03:12 PM] +13032176441 : Set the limit order at $4.43.

[9/9/25, 9:04:35 PM] J: They just ipo?

[9/9/25, 9:04:53 PM] J: Wah Singapore! <This message was edited>

[9/9/25, 9:07:19 PM] +13032176441 : Yes, dear lady, the company is from your hometown.

[9/9/25, 9:09:54 PM] J: *So I shd use up all available funds for this trade right?*

[9/9/25, 9:11:56 PM] +13032176441 : *Yes, dear lady. To aim for higher profits, you can go all-in.*

[9/9/25, 9:14:58 PM] J: <attached: 00000420-PHOTO-2025-09-09-21-14-58.jpg>

[9/9/25, 9:22:16 PM] +13032176441 : Alright, dear lady. The purchase was successful. Please provide me with a screenshot of the trade details I need it to track the trade in real time.

[9/9/25, 9:23:14 PM] J: Once it's done I will send to u

[9/9/25, 9:25:51 PM] J: Can u elaborate more on the trading strategy?" collaborative quantitative strategy and substantial institutional capital inflows"

[9/9/25, 10:32:16 PM] J: So far the buy is not secured yet

[9/9/25, 10:35:48 PM] +13032176441 : Just be patient, dear lady.

[9/9/25, 10:38:51 PM] +13032176441 : Actually, there's nothing particularly mysterious about this trade. *We received a project from the Singapore government, which is helping the local company FCHL list in the U.S. market. Regardless, it's still a foreign*

22

*enterprise if you want to go public in the U.S., you need cooperation from local institutions to facilitate many aspects of the listing. Conveniently, the institution we're currently collaborating with is a partner in this project, which gave us a portion of the allocation to help drive this trade.* So, it's not as mysterious as it might seem it's essentially a foreign company listing in the U.S., and the local institution's involvement helps generate market interest post-listing.

[9/9/25, 11:54:15 PM] +13032176441 : Dear lady, the buying pressure in the market is strong today, but there's no need to rush. Even if the price doesn't drop again today and your order isn't filled, I'll secure the lowest entry price for you tomorrow. Please don't chase the highs. We will responsibly guide you to buy at the lows and sell at the highs to maximize your profits. Stay patient and keep in touch with me at all times while awaiting further instructions.

(emphasis added).

43.     As FCHL's stock price began reaching its zenith in late September, stock promoters again pushed the stock:

Ticker Symbol: FCHL

Buy-in Price: $6.63 (please place your order at the specified price; this is essentially today's intraday low)

Per-Member Target: $50K–$80K

Expected Gain: 40%–50%

Target Sell Price: To be announced

This trade doesn't need much introduction, as we've traded this stock before, and some members have already profited from it. The reasons for buying were explained previously: with the rate cut now in place, rate-cut beneficiary stocks are leading the market, and this one is entering a second strong upward wave after its adjustment. Whether it surpasses our expectations will depend on the duration and strength of the current rate-cut cycle.

Here are two key reminders:

*Please place your orders strictly at the specified price. This is the intraday low we've secured for you.* If we give you this price, don't worry about not being able to buy in — just follow the strategy.

23

***Please avoid disclosing this trade to anyone outside our group.*** Keep it as confidential as possible so the trade can proceed smoothly.

[19/9/25, 8:45:55 PM] J: For FCHL somehow my max purchase margin is lower than for other stocks

[19/9/25, 8:48:55 PM] +13032176441 : This is because your other stocks are already occupying your

positions, so you cannot use too much margin for additional purchases, dear Madam.

[19/9/25, 8:49:36 PM] J: No, when I look at other stocks to buy, the margin limit was higher ..

[19/9/25, 8:50:28 PM] J: Strange

[19/9/25, 8:55:21 PM] J: <attached: 00000620-PHOTO-2025-09-19-20-55-20.jpg>

[19/9/25, 8:57:24 PM] +13032176441 : Alright, dear Madam, is this a purchase without using margin?

[19/9/25, 8:58:40 PM] J: This is with margin..

[19/9/25, 9:00:37 PM] +13032176441 : Alright, dear Madam.

[19/9/25, 9:09:57 PM] J: Do other traders buy with margin too?

[19/9/25, 9:11:01 PM] +13032176441 : Yes, basically every investor uses margin.

[19/9/25, 9:11:33 PM] J: I mean it's a bigger risk to buy penny stocks with margin

[19/9/25, 9:16:00 PM] +13032176441 : You're right, buying low-priced stocks on margin carries higher risk.

Therefore, our team closely monitors positions, implements strict risk controls to minimize potential losses, sets clear entry and exit points, and ensures that each trade aligns with our overall risk management strategy.

[19/9/25, 9:20:37 PM] J: Are you also investing a big amount in this trade? :)

24

[19/9/25, 9:21:56 PM] +13032176441 : Yes, for every trading plan we implement, our team participates with a significant amount of capital.

[19/9/25, 9:30:45 PM] J: Why did we choose this stock again and not other stocks we traded before?

[19/9/25, 9:43:58 PM] +13032176441 : ***Currently, our team believes this stock has great potential, especially since it is backed by the Singaporean government.***

[19/9/25, 10:45:12 PM] J: The stock just went up to $7.64, hv we missed the entry point?

[19/9/25, 10:47:48 PM] +13032176441 : Our team will make sure to find the best entry point to help everyone achieve higher profits. Please keep your order at $6.63, my friend.

[19/9/25, 10:49:13 PM] J: Ok

(emphasis added).

### D.      Regulators Take Aim at Companies Similar to FCHL

44.      While the market manipulation scheme was in progress and attempts to "pump" FCHL securities were underway, regulators were aligning their efforts to curtail such manipulation on U.S. stock exchanges.

45.      On September 3, 2025, just before FCHL's IPO, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like FCHL, that had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.

The revised standards include:

- A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.

- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.

- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.

"***Investor protection and market integrity are central to Nasdaq's mission***," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

***The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.*** The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors.[1] By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

26

> In addition to the enhanced listing standards, *Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets.*

(emphasis added.)

46. Accordingly, NASDAQ was seeking to impose more rigid standards on companies with the profile of FCHL and cooperating with both the SEC and the Financial Industry Regulatory Authority ("FINRA") to identify manipulative trading activities.

47. On September 5, 2025, the SEC issued a press release, which announced "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

48. On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

> According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. *OST is a Cayman Islands company with its principal operations in China*, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.

According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions.*** In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.

The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***

(emphasis added.)

49.    On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (ECF No. 7).[1] Therein, the SEC stated the following, in pertinent part:

SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation***

---

[1] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

28

*Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").* In the days, weeks, and/or months following its IPO, each issuer's securities *experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.* Today, these issuers' securities typically trade at a fraction of the offering price.

SEC Staff's investigation indicates that *the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.* Specifically, SEC Staff has information that tends to show that:

- individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;

- shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and

- the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.

(emphasis added.)

50.    Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest in," and that one alleged entity connected with the scheme

"disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[2]

51.     Accordingly, regulators had identified companies with a similar profile to FCHL - recently IPO-ed, foreign micro-cap companies with miniscule public floats - as, at minimum, problematic for investors, and at most, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ were actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

### E.     The Truth Emerges as FCHL Shares Dumped

52.     On September 23, 2025, the Company opened for trading at $7.35 per share and within minutes, a surge of sell orders starting at 10:04 AM EST, caused the stock to plummet from a trading of $7.20 to $6.02 per share by 10:07:50 AM EST on trading volume of 462,843, nearly one quarter of the total public float. The extreme volume and price activity triggered a halt in trading by NASDAQ between 10:07:50 AM EST and 10:22:50 AM EST.

53.     When the Company's stock resumed trading at 10:22:50 AM EST, its stock price had declined to $4.64 per share, a drop of 35.6% in a matter of minutes despite no news or information regarding the Company. FCHL stock traded for approximately two minutes before it was halted again between approximately 10:24 AM EST and 10:49 AM EST.

---

[2] At this time, Plaintiff lacks sufficient information linking Han Peiyong or his affiliates directly to FCHL and accordingly, cannot name Mr. Peiyong in connection with this Complaint, however, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to FCHL and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

54. When FCHL resumed trading at 10:49 AM EST, the resumption lasted just one minute with FCHL stock being traded 170,530 times with the stock price declining another $1.22 per share, down to $3.42 per share.

55. Trading in FCHL stock was then halted again for approximately a half-hour and resumed trading at 11:29 AM EST and was available to be traded for approximately two minutes between 11:29 AM EST and 11:31 AM EST. Upon the resumption of trading at 11:29 AM EST, the Company's stock price declined to $1.80 per share, a drop of $5.55 per share or 75.5% from open. During this brief window, the Company's trading volume was 179,681.

56. When FCHL resumed trading at 11:40 AM EST, the stock opened at $1.47 per share. However, the Company's stock would remain open for trading only until approximately 11:51 AM EST, when another halt for Limit-Up Limit Down Trading Pause after the stock was traded in excess of 2.5 million times in a matter of ten minutes.

57. Finally, following another brief, final halt, FCHL stock resumed trading at approximately 11:55 AM and continued to trade through the remainder of the day, closing at $1.10 per share, a single day decline of 84.1% on total trading volume of 19,268,300, a float-turnover ratio of 5.13.

58. Accordingly, the Company's market capitalization has suffered significantly. At closing on the date of its IPO, FCHL's market capitalization was $72.25 million. At present, the Company's market capitalization is approximately $1.82 million, a collapse of 97.5%.

59. Through the 84.1% single-day decline, numerous halts in trading of the stock and the accompanying trading volume, the truth was revealed that FCHL was used as a vehicle for a market manipulation scheme designed to "pump and dump" the common stock with investors suffering extreme losses.

31

## V.    AUDITOR DEFENDANT ALLEGATIONS

60.    The Auditor Defendant certified in the Prospectus and as part of the Registration Statement that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the company as of December 31, 2024 and 2023 and the results of its operations and cash for each of years ended December 31, 2024 and 2023, in conformity with the account principles generally accepted in the United States of America ('U.S. GAAP')." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

61.    In issuing its audit opinion on FCHL's financial statements, the Auditor Defendant failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards of the Public Certified Accounting Oversight Board ("PCAOB") requirements. These standards required the Auditor Defendant to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.

62.    In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review FCHL's business and accounting practices, and to test the Company's internal accounting information and publicly

32

reported financial statements. Accordingly, the Audit Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

## VI.    CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired FCHL securities between September 4, and September 23, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

64.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FCHL's shares actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of FCHL shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by FCHL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

66.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

67.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of FCHL; and

      c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

68.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

69.    The market for FCHL securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, FCHL securities traded at artificially inflated prices during the Class Period. Plaintiff and

34

other members of the Class purchased or otherwise acquired FCHL securities relying upon the integrity of the market price of the Company's securities and market information relating to FCHL and have been damaged thereby.

70.    Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of FCHL securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about FCHL's business, operations and prospects as alleged herein.

71.    At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FCHL's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.  LOSS CAUSATION

72.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

35

73.     During the Class Period, Plaintiff and the Class purchased FCHL's securities at artificially inflated prices and were damaged thereby. The price of FCHL's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.    SCIENTER ALLEGATIONS

74.     As alleged herein, Defendants acted with scienter because Defendants: (1) knew or should have known that the public documents and statements issued or disseminated in the name of FCHL were materially false and/or misleading; (2) knew or should have known that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FCHL, their control over, and/or receipt and/or modification of FCHL's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

75.     The market for FCHL's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, FCHL's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying

36

upon the integrity of the market price of FCHL's securities and market information relating to the Company, and have been damaged thereby.

76.     During the Class Period, the artificial inflation of FCHL's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about FCHL's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of FCHL and its business, operations, and prospects, thus causing the price of FCHL's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

77.     At all relevant times, the market for FCHL securities was an efficient market for the following reasons, among others:

        a.      FCHL shares met the requirements for listing and were listed and actively traded on the NASDAQ, a highly efficient and automated market; and/or

        b.      FCHL communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

78.     As a result of the foregoing, the market for FCHL securities promptly digested current information regarding FCHL from all publicly available sources and reflected such

37

information in FCHL's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of FCHL's securities at artificially inflated prices and a presumption of reliance applies.

79.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

80.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of FCHL who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase FCHL securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

83.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for FCHL securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

84.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about FCHL's financial well-being and prospects, as specified herein.

85.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of FCHL's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of materials facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

86.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

87.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to

40

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing FCHL's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

88. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of FCHL securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired FCHL securities during the Class Period at artificially inflated prices and were damaged thereby.

89. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that FCHL was experiencing, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their FCHL securities, or, if they had

acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

90.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

92.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

93.     Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

95.     As set forth above, FCHL and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    PRAYER FOR RELIEF

96.     WHEREFORE, Plaintiff prays for relief and judgment, as follows:

      a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

      b.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      c.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      d.     Such other and further relief as the Court may deem just and proper.

### <u>JURY TRIAL DEMANDED</u>

97.     Plaintiff hereby demands a trial by jury.

Dated: April 17, 2026

43

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/ Benjamin Y. Kaufman
Benjamin Y. Kaufman
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
kaufman@whafh.com
guiney@whafh.com
donovan@whafh.com