UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE FITNESS CHAMPS HOLDINGS SECURITIES LITIGATION | Case No. 26-cv-03182 (DLC)<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 8

A. Plaintiffs ..... 8

B. Defendants ..... 8

IV. SUBSTANTIVE ALLEGATIONS ..... 12

A. Company Background and Business ..... 12

B. Pump-and-Dump Schemes Involving Microcap Asian Companies Were Escalating and Well-Documented Before the Company Went Public ..... 14

C. Microcap Pump-and-Dump Schemes Lead to Long-Term Trading Halts ..... 20

D. Telltale Signs of Microcap Pump-and-Dump Schemes ..... 21

E. The Gatekeeper Defendants Repeatedly Facilitated Microcap Pump-and-Dump Schemes ..... 21

*1. Bancroft* ..... 21

*2. Onestop* ..... 26

*3. Cogency Global* ..... 28

F. FCHL Used Gatekeepers with a Known Record of Pump-and-Dump Schemes and Went Public Despite Warning Signs That the Company Was Susceptible to a Microcap Pump-and-Dump Scheme ..... 31

V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT ..... 35

A. False and Misleading Statements and Omissions Regarding the Risk of A Pump-and-Dump Scheme ..... 35

B. False and Misleading Statements and Omissions Regarding the Company's Business and Operations ..... 39

VI. THE TRUTH BEGINS TO EMERGE ..... 50

VII. AUDITOR DEFENDANT ALLEGATIONS ........ 57

VIII. POST-CLASS PERIOD EVENTS ........ 58

IX. ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO THE EXCHANGE ACT CLAIMS ........ 60

A. The Gatekeeper Defendants Knew or Recklessly Disregarded the Risk That FCHL Would Be the Subject of Fraud ........ 61

B. The Acceleration of the IPO to Avoid the Nasdaq's Moves to Stop Pump-and Dump Schemes Demonstrates Scienter ........ 62

C. Defendant Teoh's Resignation Bolsters the Inference of Scienter ........ 63

D. Defendant Lee's History of Paying Coaches' Fees in Cash Bolsters the Inference of Scienter ........ 63

E. No Safe Harbor ........ 63

X. LOSS CAUSATION ........ 64

XI. CLASS ACTION ALLEGATIONS ........ 64

XII. COUNTS ........ 67

PRAYER FOR RELIEF ........ 79

DEMAND FOR TRIAL BY JURY ........ 79

Court-appointed Lead Plaintiff Ravikiran Toghtireddy ("Lead Plaintiff") and Additional Plaintiff Lim Yen Nee ("Additional Plaintiff," and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint (hereinafter the "Complaint" or the "Amended Complaint") against Defendants Fitness Champs Holdings Ltd. ("FCHL" or the "Company"), Joyce Lee Jue Hui ("Lee"), Koh Yong Mong ("Koh), Teoh Siew Thim ("Teoh"), Lay Shi Wei ("Lay"), Liu Junting (Jason) ("Liu"), Tang Poh Lu ("Tang"), Bancroft Capital, LLC ("Bancroft" or the "Underwriter Defendant"), Onestop Assurance PAC ("Onestop" or the "Auditor Defendant"), and Cogency Global Inc. ("Cogency Global") (collectively, the "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, interviews with swim coaches in Singapore, and other information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons or entities, other than Defendants, who: (1) purchased or otherwise acquired FCHL's ordinary shares pursuant and/or traceable to the Registration Statement filed in connection with (i) the Company's

[1] Emphases in quotes are added unless otherwise noted.

September 3, 2025 Initial Public Offering ("IPO") and (ii) the resale of 2,113,500 FCHL ordinary shares by Easy Builder Limited ("Easy Builder"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); and/or (2) purchased or otherwise acquired FCHL's ordinary shares between September 3, 2025 and September 23, 2025, both dates inclusive (the "Class Period"), on the Nasdaq Capital Market of the Nasdaq Stock Market ("Nasdaq") or another U.S. trading venue, seeking to pursue remedies under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Since at least early 2024, a wave of pump-and-dump market manipulation schemes targeting microcap Asian companies that are newly listed in the United States emerged. This trend rapidly escalated, and in 2025 alone, the FBI reported a 300% increase in complaints about pump-and-dump schemes orchestrated on messaging applications or via social media that involved Asian microcap companies. The scheme was invariably the same: stock manipulators, often impersonating others, circulated false promotional materials in WhatsApp chatrooms, WeChat groups, and on platforms like Twitter (X), pressuring investors to buy shares. The targeted companies fit a specific profile. Almost all sought to raise $15 million or less in the United States, had a low public float, dominant insider control, obscure businesses with little to no revenues, significant losses, and no meaningful analyst coverage.

3. Because of the low public float, in particular, manipulators can easily use online promotions to drive up prices to spectacular heights before dumping their shares on unsuspecting investors at peak prices. Before FCHL went public, the stock prices of numerous Nasdaq-listed microcap companies of Asian origin collapsed by between 84% and 93% in a single month, and both Congress and the SEC had greatly increased their scrutiny of these schemes. Within just days

of FCHL's IPO, the U.S. Department of Justice ("DOJ") seized assets and indicted insiders tied to at least one such scheme, and within just one month of the IPO, the SEC suspended trading in at least five microcap Asian companies because their stocks were manipulated in similar pump-and-dump schemes.

4. Because of the growing epidemic of manipulation in low float Asia-based microcap IPOs, U.S. regulators, law enforcement agencies, and self-regulatory organizations took a series of steps to investigate microcap IPO pump-and-dump schemes. FCHL rushed its IPO to avoid this growing scrutiny from posing an obstacle to its IPO, asking the SEC on August 29, 2025 that the effective date of FCHL's defective Registration Statement "be accelerated so that it will become effective at 4:00 p.m., Eastern Time, on September 3, 2025, or as soon thereafter as possible." Bancroft made the same request that the SEC accelerate the effective date of the Registration Statement, helping ensure that the offering was listed and completed before regulatory and law enforcement attention could disrupt or prevent the IPO.

5. FCHL shared the same characteristics as other Asian microcap IPO pump-and-dumps. The Company is a holding entity incorporated in the Cayman Islands with no material operations of its own, and the operating subsidiaries — Fitness Champs Pte. Ltd. ("Fitness Champs") and Fitness Champs Aquatics Pte. Ltd. ("Fitness Aquatics") — conduct a small business, providing swimming lessons in Singapore, primarily to children. The Company had low revenues and minimal profits. A single insider dominated voting control over FCHL: Defendant Lee, FCHL's Chief Executive Officer ("CEO"), controlled over 51% of aggregate voting power after the IPO, leaving public investors with no meaningful say over the Company's affairs. Most importantly, the Company's post-IPO public float was only approximately 22% of total shares outstanding, making the stock extraordinarily easy to squeeze during the Class Period. In every

material respect — obscure business practices, minimal revenue, going concern doubt, dominant insider control, and a negligible float — FCHL was a textbook candidate for the social media-driven pump-and-dump schemes that increased to a fever pitch before FCHL's IPO.

6. Even worse, the three gatekeepers FCHL chose for the IPO had already been part of many similar pump-and-dump IPOs. In the United States, issuers seeking to go public typically contract with one or more underwriters, an auditor authorized to practice before the SEC, and for foreign companies, a U.S. representative agent. For each, FCHL selected entities linked to a history of pump-and-dump schemes. Underwriter Bancroft, auditor Onestop, and U.S. representative Cogency Global (hereinafter the "Gatekeeper Defendants") all repeatedly facilitated microcap pump-and-dump schemes before FCHL's IPO.

7. An investigation by *The Philadelphia Inquirer* found that, from the spring of 2024 through September 2025, Bancroft served as the lead underwriter for eleven microcap IPOs, nine of them traded between 54% and 98% below their IPO prices as of May 1, 2026, and trading in the two remaining companies had been suspended by Nasdaq. Six of these companies were—like FCHL—based in Singapore, and four others were based in Hong Kong.

8. Cogency Global served as the U.S. agent for more than ten other companies that were part of pump-and-dump schemes, and Onestop was the auditor for numerous companies involved in similar market manipulation schemes before FCHL went public.

9. None of these known risks were accurately disclosed in the defective Registration Statement used to sell FCHL ordinary shares to U.S. investors. Instead, the defective Registration Statement merely warned that "certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company," and that FCHL

"may experience similar volatility." The Registration Statement did not warn investors that FCHL's underwriter, auditor, *and* U.S. agent were all connected to numerous of those "certain recent [IPOs]" that were involved in pump-and-dump trading schemes designed to scam investors. Further, the Registration Statement did not warn that these facts—and other key characteristics of the Company—created a heightened risk that the Company's ordinary shares would be subject to a market manipulation scheme, extreme volatility, and face a Nasdaq-imposed trading halt, or that Nasdaq might apply more stringent listing criteria because of the Company's small offering size and high insider ownership.

10. Tellingly, the Registration Statement did not acknowledge that Nasdaq had filed with the SEC two proposed rules in an effort to prevent the very type of misconduct at issue here, nor that FCHL and Bancroft had asked the SEC to accelerate the effectiveness of the Registration Statement, so that FCHL could list before Nasdaq's efforts to stop the wave of pump-and-dump market manipulation schemes involving Asian microcap companies could disrupt or even prevent the IPO.

11. Further, the defective Registration Statement failed to disclose the specific and concrete risks that FCHL's stock would be manipulated by the same social media-driven pump-and-dump schemes that had already devastated multiple other Bancroft-underwritten IPOs, or that such a scheme, once triggered, would almost certainly and permanently destroy share value.

12. This stock manipulation quickly drove the price of FCHL's ordinary shares from the $4 IPO offering price to $7.20 by September 19, 2025, when 13.265 million ordinary shares – more than 3.5 times the Company's entire public float — traded at prices between $6.32 and $7.64

per share. The float-turnover ratio of 3.63 signaled extremely high volatility.[2] That day, trading in FCHL's ordinary shares was halted by Nasdaq pursuant to a Limit-Up Limit-Down Trading Pause.

13. The next trading day, September 22, 2025, FCHL's stock price closed at $6.95 per share, on high trading volume of 6,440,000 and a float turnover ratio of 1.72, again signifying extreme volatility.

14. The following day, September 23, 2025, FCHL's ordinary shares opened for trading at $7.35 per share. Within minutes, a surge of sell orders caused the stock to plummet on high trading volume, triggering the first of several trading halts that day. At the close of trading, FCHL's share price was $1.10, representing a single-day decline of *84.1%*, on total trading volume of 19.2 million shares and a float-turnover ratio of 5.13.

15. Defendants' decision to omit the serious risks of manipulation in the defective Registration Statement is sufficient to plead strict liability claims under the Securities Act pursuant to Rule 8 of the Federal Rules of Civil Procedure.

16. In addition, the Company's profile and structure, its decision to hire seasoned facilitators of misconduct, Defendant Lee's sale of 1 million ordinary shares of her personal FCHL holdings in the IPO for $3.72 million in proceeds, and the fallout from the highly unusual trading halts are all factors that solidify an inference of fraud for Plaintiffs' Exchange Act claims.

17. In addition to the misstatements and omissions concerning the serious risks of manipulation of the Company's ordinary shares, the Registration Statement gave a false and misleading impression of the Company's competitive position in the Singapore swim coaching industry and omitted to disclose that FCHL increased the hourly rate for fees it paid to its coaches

[2] One measure of stock trading volatility is float-to-trading-volume ratio, also known as float rotation or float turnover. A ratio above 1.0 (or 100% turnover) is indicative of high volatility in a stock.

on January 1, 2025—over eight months prior to the IPO. On December 29, 2025, the Company disclosed that this fee increase drove an increase in general and administrative ("G&A") expenses, leading to higher cost of revenues and lower gross profits, and pushing the Company's financial results from the black to the red. The failure to disclose the fee increase violated Items 105 and 303 of SEC Regulation S-K, which require the disclosure of all material factors that make an investment speculative or risky as well as all material events, trends, and uncertainties reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. Further, the Registration Statement contained several statements that were materially misleading by virtue of the failure to disclose the increase in the coaches' hourly fees, which is one of the Company's most significant costs of revenue.

18. As a result of Defendants' wrongful acts and omissions, Plaintiffs and the other members of the Class have suffered significant losses and damages, and the value of their FCHL ordinary shares has been rendered worthless.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, and 77o) and under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

21. Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27(a) of the Exchange Act (15 U.S.C. § 78aa(a)) and 28 U.S.C. § 1391(b). FCHL ordinary shares traded on the Nasdaq, and Defendants targeted investors who

reside in this District with materially false and misleading statements throughout the Class Period. In addition, the Company's agent (Defendant Cogency Global) is located in this District.

22. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

23. Plaintiffs, as set forth in their previously filed Certifications (ECF Nos. 2-1 and 24-3), acquired FCHL ordinary shares pursuant and/or traceable to the Registration Statement and/or otherwise acquired FCHL ordinary shares at artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

### B. Defendants

24. Defendant FCHL is a Cayman Islands-incorporated holding company with its principal executive offices at 7030 Ang Mo Kio, Avenue 5, #04-48, NorthStar@AMK, Singapore 569880. During the Class Period, and now, the Company's ordinary shares traded on the Nasdaq under the symbol "FCHL."

25. Defendant Joyce Lee Jue Hui ("Lee"), also known as Li Juehui, founded the Company's operating subsidiary Fitness Champs in 2012 and has served as the Company's co-Executive Director and CEO since establishing the Company on February 15, 2024. Lee was the controlling shareholder of the Company before and after the completion of the IPO. Lee sold 1 million of her own FCHL ordinary shares in the IPO, for $3.72 million in proceeds. Upon the completion of the IPO, Lee still owned 51.22% of the Company's outstanding ordinary shares

through Big Treasure Investments Limited ("Big Treasure"), a company incorporated in the British Virgin Islands ("BVI") and wholly owned by Lee. Lee signed the Registration Statement.

26. Defendant Koh Yong Mong ("Koh") joined the Company in 2018 and has served as its co-Executive Director and Chief Operating Officer ("COO") since before the Class Period. Koh is the husband of Defendant Lee. Koh signed the Registration Statement.

27. Defendant Teoh Siew Thim ("Teoh"), also known as Alice Teoh Siew Thim, served as the Company's Chief Financial Officer ("CFO") since January 2024 until leaving the Company, purportedly by resigning, at some point in 2025 after the IPO. Teoh signed the Registration Statement.

28. Defendant Lay Shi Wei ("Lay") began serving as a director on FCHL's board on March 31, 2025. Defendant Lay consented to being named as a director in the Registration Statement.

29. Defendant Liu Junting (Jason) ("Liu") began serving as a director on FCHL's board on March 31, 2025. Defendant Liu consented to being named as a director in the Registration Statement.

30. Defendant Tang Poh Lu ("Tang") began serving as a director on FCHL's board on March 31, 2025. Defendant Tang consented to being named as a director in the Registration Statement.

31. Defendants Lee, Koh, Teoh, Lay, Liu, and Tang are sometimes referred to herein as the "Individual Defendants."

32. Defendant Bancroft Capital, LLC ("Bancroft" or the "Underwriter Defendant") served as the sole underwriter and book-runner for the IPO. Bancroft is incorporated under the

laws of Pennsylvania, and its headquarters are located at 501 Office Center Drive, Suite 130 Fort Washington, Pennsylvania 19034.

33. Defendant Onestop Assurance PAC ("Onestop" or the "Auditor Defendant") has served as the Company's since 2023 and is headquartered at 10 Anson Road #21-14, International Plaza, Singapore 079903.

34. Defendant Cogency Global Inc. ("Cogency Global") serves as the Company's U.S. agent to receive service of process. Cogency Global's principal place of business is located in this District at 122 E 42nd Street, 18th Floor, New York, New York 10168.

35. The Individual Defendants each signed the defective Registration Statement or gave consent to be named in the Registration Statement as a director and therefore possessed the power and authority to control its contents by insisting that misrepresentations and omissions be corrected, or by withholding his or her signature or consent until such corrections were made. The Individual Defendants were provided with copies of the Registration Statement alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent its issuance or to cause it to be corrected. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

36. Defendant Onestop issued clean audit opinions on financial statements and consented to be listed as the auditor in the Registration Statement. The Registration Statement stated that FCHL's "financial statements as of December 31, 2023 and 2024, and for each of the three years in the period ended December 31, 2022, 2023 and 2024 included in this prospectus have been audited by Onestop [], an independent registered public accounting firm." Onestop consented to the incorporation of its report dated May 14, 2025 in the Registration Statement with respect to the Company's consolidated balance sheets as of December 31, 2024 and 2023, the

related consolidated statements of operations and comprehensive income, changes in shareholders' equity and cash flows for each of the years in the three-year period ended December 31, 2024 and the related notes. Onestop also consented to being referred to under the heading "Experts" in the Registration Statement. As the auditor at the time of the IPO, Onestop had access to material non-public information. Onestop did not conduct a reasonable investigation and have reasonable grounds to believe, at the time the Registration Statement became effective, that the Registration Statement did not contain any untrue statement of material fact and did not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Onestop also knew, or was negligent in not knowing, that numerous other low-float Asian IPOs to which it had lent its name were manipulated in pump-and-dump schemes, injuring investors. Therefore, Onestop is also liable for the false statements and omissions pleaded herein.

37. Defendant Bancroft was the underwriter for FCHL's IPO, along with many other low float pump-and-dump IPOs of Asian microcap companies. As the underwriter, Bancroft is statutorily liable for misrepresentations and omissions under the Securities Act. Bancroft did not conduct a reasonable investigation and have reasonable grounds to believe, at the time the Registration Statement became effective, that the Registration Statement did not contain any untrue statement of material fact and did not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

38. Defendant Cogency Global was the Company's agent in the U.S. and lent its name to the Company's IPO. Due to its position, Cogency Global had the ability and opportunity to prevent issuance of the false and misleading Registration Statement, and/or cause it to be corrected, including by insisting that its name could not be used in the Registration Statement unless the misrepresentations and omissions were corrected. Cogency Global did not conduct a reasonable

investigation and have reasonable grounds to believe, at the time the Registration Statement became effective, that the Registration Statement did not contain any untrue statement of material fact and did not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Therefore, it is also liable for the false statements and omissions pleaded herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background and Business

39. FCHL is a holding company that conducts its purported business operations in Singapore through two wholly-owned subsidiaries: Fitness Champs and Fitness Aquatics. FCHL purports on its website to be "a distinguished sports education provider, playing a pivotal role in shaping the aquatic landscape in Singapore." The Company reports that its group structure also includes the wholly-owned subsidiary Northen Star Limited, a BVI company that holds all 10,000 issued shares of Fitness Champs and all 1,000 issued shares of Fitness Aquatics.

40. According to the Registration Statement, Defendant Lee established Fitness Champs in 2012 in order to provide swim instruction in public schools in Singapore. Defendant Lee established Fitness Aquatics in 2015 in order to provide swim instruction to private sector students in Singapore.

41. Defendant Lee controlled the Company with an interest of over 64.7% of FCHL's ordinary shares before the IPO. Defendant Lee profited by selling 1 million of her own shares in the IPO, for $3.72 million in proceeds after underwriting discounts and commissions. Despite this massive sale, Lee maintained control; immediately after the IPO, she owned 51.22% of FCHL's ordinary shares.

42. Pre-IPO, another 19.09% of the Company's ordinary shares were owned by Easy Builder Limited ("Easy Builder"), a BVI corporation wholly owned by Mr. Hong Shieh Yung

Travis and one of a handful of pre-IPO investors. According to the IPO Prospectus, Easy Builder, which was an affiliate and not an independent third party, sold 750,000 of its ordinary shares pursuant to the IPO Prospectus, reducing its ownership stake to 12.43%. In addition, Easy Builder offered another 2,113,500 ordinary shares pursuant to the Resale Prospectus. Thus, public investors had no ability to meaningfully influence FCHL's decisions.

43. The Company reported only S$4.21 million in revenue and S$1.52 million in gross profit in its annual report on Form 20-F for the year ended December 31, 2024 (the "2024 20-F"). The 2024 20-F reported that, after deducing operating costs and expenses, the Company had only S$46,000 in profit from operations for that year. "S$" denotes Singaporean dollars. The 2024 20-F utilized an exchange rate of $1 (one U.S. dollar) to S$1.3662. Applying that exchange rate, the 2024 20-F reported that FCHL generated approximately $3.09 million in revenue, $1.11 million in gross profit, and $34,000 in profit from operations for the year ended December 31, 2024.

44. Though the Company's SEC filings do not disclose the number of employees, they indicate that there are very few full-time employees. For instance, the Company's annual report on Form 20-F for the year ended December 31, 2025 (the "2025 20-F") reported that the Company's staff costs, which included "salaries, employee benefits, retirement contributions for administrative employees, and directors' remuneration," were approximately S$1.368 million. The 2025 20-F also reported that the Company paid an aggregate of approximately S$1,123,000 in cash to its six Executive Directors and Executive Officers, which included Defendants Lee, Koh, and Teoh, as well as a Financial Controller (Chia Nyoke Yee, who was hired in 2025), a Head of Administration / Business Development (Lian Lai Hong, Jerrica), and a Head of Training (Yao Peikang), leaving only a reminder of S$245,000 that covered employee benefits, retirement contributions for administrative employees, and directors' remuneration. Per the 2025 20-F, the

Company paid S$132,000 in required contributions to retirement plans that year. Further, the Company also disclosed that for 2025 it entered into agreements with its three independent directors to pay them $50,000, $30,000, and $30,000, respectively, for a one-year term. Applying the exchange rate of $1.00 = S$1.2841 used in the 2025 20-F, independent director fees totaled approximately S$141,251. In addition, the Company's SEC filings indicate that its headquarters is 1,036 square feet. These various pieces of information suggest that the Company had zero full-time employees other than the six Executive Directors and Executive Officers listed above. The coaches through which the Company provides its swimming lesson services are independent contractors.

### B. Pump-and-Dump Schemes Involving Microcap Asian Companies Were Escalating and Well-Documented Before the Company Went Public

45. A record number of Chinese companies went public in the United States in calendar year 2024, in addition to other Asian companies. Amidst this increase, a significant number of pump-and-dump market manipulation schemes tied to microcap companies based in Asia emerged.

46. In calendar year 2025, the FBI observed a 300% increase compared to the previous year in complaints concerning pump-and-dump schemes related to microcap companies based in Asia that were principally orchestrated on social media (hereinafter the "Microcap Pump-and-Dump Schemes").[3] Purported stock tips were circulated in WhatsApp chatrooms, Twitter (X), and other social media platforms, pressuring investors to act quickly on a market-moving event.

---

[3] Federal Bureau of Investigation, *Fraudsters Target US Stock Investors through Investment Clubs Accessed on Social Media and Messaging Applications* (July 3, 2025), https://www.ic3.gov/PSA/2025/PSA250703.

47. Like FCHL, the targeted stocks concerned small Asian companies with obscure businesses, little potential for growth, barely any revenue, small public floats, and tight control exercised by majority shareholders.

48. Manipulators act in concert with company insiders to pump up the stock price by disseminating misleading promotional statements in investor chatrooms and other social media platforms. The targets are almost always individual investors. Because of the small number of shares available to trade and the absence of neutral analyst coverage, stock prices rise dramatically after stock manipulators start buying shares. The stock manipulators then dump the shares on retail investors at artificially high prices, who are left holding the bag. In the worst scenarios, the stock is indefinitely halted, leaving the retail investors without the ability to sell their shares at any price.

49. On March 20, 2025, the DOJ seized $214 million from the U.S. bank accounts of promoters tied to China Liberal Education Holdings Ltd. ("CLEU"), a company based in China and incorporated in the Cayman Islands that purported to provide "consulting services . . . to improve campus information and data management systems" and "job readiness training to graduate students." CLEU had gross revenue of only $2.9 million and operated at a net loss of $4.9 million in 2023. CLEU issued tens of millions of shares to accounts controlled by stock manipulators at $0.6 per share. The manipulators impersonated investment advisors, then drove up the price of the stock by disseminating false information on social media, and sold their CLEU holdings at as high as $7.75 a share, reaping hundreds of millions of dollars in profit.

50. The CLEU stock manipulation scheme was not an isolated incident. In the month of July 2025 alone, at least another 5 Nasdaq-listed Chinese or Asian companies were involved in pump-and-dump schemes before their stock prices collapsed by 84%-93%. Top King Win (Nasdaq: WAI) fell around 84% from July 3 to July 7, 2025; Park Ha Biological Technology Co.,

Ltd. (Nasdaq: PHH) fell around 93% on July 8, 2025; Concorde International Group (Nasdaq: CIGL) fell around 93% on July 10, 2025; Everbright Digital Holding (Nasdaq: EDHL) fell around 89% from July 11 to July 14, 2025; and Picocela (Nasdaq: PCLA) fell around 85.6% on July 15, 2025.

51. Following these schemes, on September 4, 2025, Nasdaq filed a proposed rule with the SEC to adopt heightened initial listing standards for microcap companies that operated in China, including Hong Kong and Macau, requiring them to raise at least $25 million in IPO proceeds to list shares on the Nasdaq (the "Proposed Rule"). Nasdaq stated that the smaller offering sizes and public floats of these microcap Chinese securities made them more susceptible to manipulation.

52. Also on September 4, 2025, Nasdaq filed a proposed rule with the SEC to adopt heightened initial listing standards for microcap companies that apply for listing under the "net income standard," which had a lower requirement for the "Market Value of Unrestricted Publicly Held Shares" (or "MVUPHS"). Nasdaq proposed to raise the MVUPHS from $5 million to $15 million, stating that it observed problems with the trading of smaller company listings with low liquidity, including a lack of price discovery and ongoing noncompliance with Nasdaq's listing rules.

53. On September 5, 2025, the SEC announced a cross-border task force to combat Microcap Pump-and-Dump Schemes involving microcap companies based in foreign jurisdictions. The task force also focuses its enforcement efforts on auditors and underwriters who assist the companies with going public in the United States.

54. On September 12, 2025, the DOJ unsealed a criminal indictment charging co-CEO of Ostin Technology Group Co. ("Ostin") and a financial adviser with conspiracy to commit

securities fraud and wire fraud, securities fraud under Title 18, wire fraud, and securities fraud under Title 15. The indictment alleged that those two defendants, along with at least fifteen co-conspirators, bilked investors out of more than $100 million by artificially inflating the shares of the China-based company. Ostin's stock price fell by approximately 93% upon the revelation of a pump-and-dump scheme on June 26, 2025. Incorporated in the Cayman Islands, Ostin claimed to supply "display modules and polarizers in China" and operated at a net loss of over $10 million in 2024.

55. On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (ECF No. 7).[1] Therein, the SEC stated the following, in pertinent part:

> SEC Staff is investigating whether *dozens of IPOs registered with* the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation ***Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:
>
> - individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;
> - shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and

- the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.

56. Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest in," and that one alleged entity connected with the scheme "disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."

57. On September 18, 2025, the chairman of the SEC stated at an investor advisory committee meeting that the trend of foreign companies "incorporating in a jurisdiction, such as the Cayman Islands, that differs from where the company is headquartered [and] operates" behooves the SEC to consider whether "the current [disclosure] standard for [] foreign companies" no longer "make[s] sense."[4]

58. Between September 26, 2025 and December 4, 2025, the SEC halted trading for at least twelve companies involved in Microcap Pump-and-Dump Schemes. On December 3, 2025, the SEC chairman told Fox Business News the SEC had issued trading suspensions because the securities were being manipulated. On March 22, 2026, the director of the SEC's trading and markets division told the Financial Times that "[p]ump-and-dump schemes among Chinese stocks

[4] Paul S. Atkins, *Remarks at the Investor Advisory Committee Meeting*, SEC (Sept. 18, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-091825-remarks-investor-advisory-committee-meeting (last visited June 8, 2026).

are quite serious" and the SEC had learned from large retail brokers since the summer of 2025 that the issue was leading to substantial investor losses.[5]

59. On February 20, 2026, Nasdaq filed another proposed rule change with the SEC concerning delisting companies whose stock had been suspended from trading by the SEC. Nasdaq "believe[d] that the ability of third parties to manipulate a security's price can indicate that the security does not have sufficient liquidity, and the issuing company does not have sufficient market interest, for listing to be appropriate."[6]

60. Congress has also started to pay attention to Microcap Pump-and-Dump Schemes. On March 19, 2026, the U.S. Senate banking committee sent a bipartisan letter to the chairman of the SEC, highlighting the "deceptive social-media campaigns" related to market manipulation of the Asia-based companies that the SEC suspended for schemes to inflate price and volume. In the letter, Senators Tim Scott and Elizabeth Warren demanded that the SEC focus on protecting investors from risks to "market integrity and investor protection posed by . . . entities with ties to [China]."

61. Accordingly, regulators had identified companies with a similar profile to FCHL—recently IPO-ed, foreign microcap companies with miniscule public floats—as, at minimum, problematic for investors, and at most, vehicles specifically designed to deceive investors, commit securities fraud, and manipulate the market. Further, the SEC and DOJ were actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

---

[5] Sun Yu and Cheng Leng, *Chinese IPOs in US falter amid scrutiny of manipulation schemes*, FINANCIAL TIMES (Mar. 22, 2026), https://www.ft.com/content/6e972cbf-c8d5-420f-8f7c-9ae26a8c07fe?syn-25a6b1a6=1 (last visited June 8, 2026).

[6] https://www.federalregister.gov/documents/2026/06/08/2026-11379/self-regulatory-organizations-the-nasdaq-stock-market-llc-noticing-of-filing-of-amendment-no-1-and

### C. Microcap Pump-and-Dump Schemes Lead to Long-Term Trading Halts

62. Under Section 12(k)(1)(A) of the Exchange Act, the SEC has authority to suspend trading in a security for a period of up to ten business days if it believes it is in the public interest and protects investors. 15 U.S.C. § 78l(k)(1)(A). The SEC can halt trading when there is potential market manipulation.[7]

63. Nasdaq has the ability to halt trading of a security indefinitely when it requests from the issuer: (a) information relating to material news; (b) information relating to the issuer's ability to meet Nasdaq listing qualification requirements, as set forth in the Listing Rule 5000 Series; or (c) any other information which is necessary or important for maintaining a fair and orderly mark. *See* Nasdaq Rule 4120(b)(1)(B).

64. Historically, most companies subject to the 10-day SEC trading halts are those traded in the Over the Counter (OTC) market, and trading halts are lifted after the company provides the requested information.[8] A 10-day SEC trading halt is highly unusual. In 2022, the SEC suspended trading of only two securities. In 2023, the SEC suspended trading of only four securities.

65. In 2024, the SEC suspended trading of only two securities, both of which involved Microcap Pump-and-Dump Schemes. In September through December 2025 alone, however, the SEC suspended trading in twelve securities that were tied to Microcap Pump-and-Dump Schemes.

---

[7] SEC, *Investor Bulletin: Trading Suspensions* (May 2012), at 1, https://www.sec.gov/files/tradingsuspensions.pdf.

[8] https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions.

**D. <u>Telltale Signs of Microcap Pump-and-Dump Schemes</u>**

66. Several factors are common in Microcap Pump-and-Dump Schemes. They all have small operations, generally peddle obscure products or services, and are dominated by one or more controlling shareholders who also serve as the principal managers of the company.

67. The limited float of initial offerings enables manipulators to move a stock price without deploying much capital, because they only need to acquire or influence a low number of shares.

68. The presence of a controlling shareholder significantly helps to reduce the number of shares available to trade (the public float), thereby making it easier for manipulators to acquire a critical mass of shares to manipulate the prices.

69. Other Microcap Pump-and-Dump Scheme companies Bancroft brought public show that at least three of the four telltale signs were present: Chinese/Asian ownership, obscure businesses, little to no income, and tight control exercised by majority shareholders. *See* ¶¶71-81.

70. Several companies involved in Microcap Pump-and-Dump Schemes have relied on the same gatekeepers to go public, including the Gatekeeper Defendants named in this Complaint.

**E. <u>The Gatekeeper Defendants Repeatedly Facilitated Microcap Pump-and-Dump Schemes</u>**

*1. Bancroft*

71. Bancroft has been the underwriter of choice for numerous microcaps whose stock prices collapsed and/or were implicated in pump-and-dump schemes. An investigation by *The Philadelphia Inquirer* found that, from the spring of 2024 through September 2025, Bancroft served as the lead underwriter for eleven microcap IPOs, nine of them traded between 54% and 98% below their IPO prices as of May 1, 2026, and trading in the two remaining companies had

been suspended by Nasdaq. Six of these companies were—like FCHL—based in Singapore, and four others were based in Hong Kong.

72. Bancroft served as the lead underwriter for the July 2025 IPO of Dreamland Limited ("Dreamland"), a Cayman Islands company based in Hong Kong, which conducted an $8 million IPO, including $2.64 million from shares sold by a selling shareholder. Within three months of its IPO, on October 10, 2025, Dreamland experienced an extreme single-day decline of 84%, declining from a closing price of $30.50 per share on October 9, 2025 to $5.80 per share on October 10, 2025. Following a 1-for-5 reverse split that occurred on April 20, 2026, Dreamland stock surged from a closing price of $2.36 per share to $23.05 per share, a single-day increase of 1,805% on May 13, 2026, before declining 97.33% on May 14, 2026, to $0.80 per share. Notably, Fuji Holdings Limited ("Fuji Holdings"), a company wholly owned by Mr. Chang Kin Man – who *also* owned Fuji Investment Limited ("Fuji Investment"), one of the BVI entities that narrowly avoided the 5% lock-up threshold with respect to its stake in FCHL (holding 4.9% of FCHL prior to the Company's IPO) – owned a 4.50% pre-IPO equity stake in Dreamland that it acquired for $250,000. Dreamland filed a resale prospectus concurrent with its IPO, enabling Fuji Holdings to sell its Dreamland position for a profit concurrently with, or after, Dreamland's IPO.

73. On June 26, 2026, the U.S. Attorney for the Southern District of New York and the Federal Bureau of Investigation announced the filing of a civil forfeiture complaint arising out of the pump-and-dump manipulation scheme involving Dreamland, freezing an account held by the so-called Imperial Vision Fund SPC Series 1 SP (the "Imperial Vision Fund"). Just three days before the civil forfeiture complaint was filed, on June 23, 2026, Dreamland filed a Current Report on Form 6-K disclosing that in an offshore private placement transaction the Imperial Vision Fund had purchased 320,000 shares at the price of $3.75 per share. Then, on August 11, 2026,

Dreamland filed a Current Report on Form 6-K revealed that its CEO transacted with the Imperial Vision Fund to acquire 320,000 shares of Dreamland at a price of $3.75 per share.

74. Bancroft underwrote the September 25, 2024 IPO of Premium Catering (Holdings) Ltd. ("Premium Catering"), a Cayman Islands company headquartered in Singapore. After Premium Catering raised $9.5 million from public investors at an offering price of $4.75 per share, the stock price traded at over $45 per share within a matter of days, before collapsing on October 23, 2024. After the stock dropped below Nasdaq's minimum bid requirements, the company's board authorized a 9:1 reverse stock split. On October 17, 2025, the SEC temporarily suspended trading in Premium Catering securities because of potential manipulation effectuated through recommendations made to investors by unknown persons via social media to purchase such securities, which appeared to be designed to artificially inflate the price and trading volume of those securities. Nasdaq then announced that trading in Premium Catering stock was halted pending the receipt of information from the company, and would remain halted until the company fully satisfied Nasdaq's request for additional information. Trading has not resumed.

75. Bancroft also underwrote the August 12, 2025 IPO of Magnitude International Ltd. ("MAGH"), another Cayman Islands company headquartered in Singapore. MAGH raised $8.8 million from investors at $4 per share. A short report revealed that offshore shell companies—including a company controlled by MAGH's chairman—received hundreds of thousands of shares at a price of $0.000025 per share just days before the company filed a Form F-1. Overall, 8.8 million pre-IPO shares held by insiders were registered for resale and were not subject to lock-up agreements or other trading constraints, with none of the proceeds of sales of those shares going to MAGH. On December 5, 2025, the SEC temporarily suspended trading in MAGH securities because of potential manipulation effectuated through recommendations made to investors by

unknown persons via social media to purchase, hold, and/or sell MAGH securities and to send screenshots documenting their transaction. These recommendations appeared to be designed to artificially inflate the price and trading volume of MAGH securities. As with Premium Catering, MAGH did not respond to Nasdaq's subsequent requests for information, and Nasdaq subsequently announced that it would delist MAGH stock. Trading never resumed after the SEC suspension.

76. Bancroft was the sole lead underwriter and book-running manager on the July 10, 2025 IPO of Delixy Holdings Limited ("Delixy"), priced at $4.00 per share for total proceeds of $8,000,000. On September 30, 2025, Delixy experienced a massive single-day decline of 83.18%, declining from a closing price of $6.72 on September 29, 2025, down to $1.13 per share on September 30, 2025. Delixy was halted on that day from trading due to volatility, but later resumed trading. On July 29, 2026, two independent members of the Delixy Board of Directors resigned. A resale prospectus was filed alongside the Delixy IPO allowing multiple foreign entities – Cosmic Magnet Limited (4.9%) wholly owned by Tan Siok Sing; Dragon Circle Limited (4.9%) wholly owned by Hong Shieh Jang; Rosywood Holdings Limited (4.9%) wholly owned by Wu Ke'Er Holly Elenna; and Golden Legend Ventures Limited (3.34%) wholly owned by Chor Chung Heong – to sell their shares at any time following the IPO. These entities all acquired their interests pre-IPO for nominal value.

77. Bancroft was the sole lead underwriter in connection with the July 2024 IPO of Primega Group Holdings (now DirectBooking Technology Co., Ltd.) ("Primega") which has collapsed over 99% from its highest closing price in October 2024 and been halted multiple times for volatility.

78. Bancroft was the sole underwriter in connection with October 2024 SKK Holdings Limited ("SKK") initial public offering, which traded as high as $11.45 per share on November 18, 2024, before closing at $1.84 per share on that same day, is now trading for approximately $0.44 per share (not adjusting for a 10:1 reverse stock split) and has been halted multiple times for volatility.

79. Bancroft was also the lead underwriter on the January 2025 initial public offering of Hong Kong Pharma Digital Technology Holdings Limited (now named Cellyan Biotechnology, Co. Ltd.) ("Hong Kong Pharma"). During a day of substantial decline, Hong Kong Pharma stock experienced trading volume of 157 million shares on just 1.4 million shares publicly outstanding, indicating excessive volatility and potential manipulation in the stock. It now trades at approximately $0.13 per share.

80. Bancroft served as the representative of underwriters on the February 2025 TEN Holdings Inc. ("TEN") initial public offering, which surged to over $90.00 per share on the IPO, but suffered a steep decline thereafter and now trades at approximately $10.51 per share, or approximately $0.70 before adjusting for a December 2025 15:1 reverse stock split. On November 14, 2025, TEN filed a Form 10-Q with the SEC, revealing that: (i) on October 27, 2025, TEN received a grand jury subpoena from the U.S. Attorney's Office for the Southern District of New York for the production of documents related to TEN's IPO; and (ii) on October 28, 2025, TEN learned that the SEC was conducting a related investigation. Then, on March 10, 2026, the SEC subpoenaed both TEN and its former CEO seeking records and communications related to the investigations. On May 8, 2026, the company announced that its then-CEO Randolph Jones was stepping down as CEO and Chairman of TEN's board. On August 10, 2026, TEN disclosed that following an internal investigation, its board concluded that certain agreements executed by former

management in connection with the IPO "lacked economic substance and any direct benefit to the Company" and may have "solely benefitted the counterparties to those agreements rather than the Company."

81. Finally, Bancroft was the lead managing underwriter and book-runner on the October 2025 Republic Power Group Limited ("Republic Power") initial public offering, which surged on the IPO up to $99.60 per share and, following a substantial decline, now trades at approximately $0.0018 per share before adjusting for two reverse stock splits.

*2. Onestop*

82. Onestop has audited numerous companies involved in Microcap Pump-and-Dump Schemes. Prior to that, moreover, the Public Company Accounting Oversight Board (the "PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, identified deficiencies in an audit conducted by Onestop. On July 13, 2023, the PCAOB released an inspection report identifying the following deficiencies in an audit conducted by Onestop: (1) Onestop's audit report did not include the required explanation of Onestop's responsibilities with respect to Internal Control over Financial Reporting (ICFR); (2) Onestop did not timely file its report with the PCAOB; and (3) Onestop's report failed to disclose information concerning participation in the audit by another accounting firm. These deficiencies violated PCAOB rules.

83. In addition, like Bancroft, many of Onestop's clients have been microcap companies whose stock prices collapsed and/or were implicated in pump-and-dump schemes.

84. On July 3, 2023, the SEC announced that it settled charges against Future FinTech Group Inc. ("Future FinTech"), a company audited by Onestop, for accounting fraud violations "arising out of the Company's filing of materially inaccurate annual reports and its failure to maintain adequate books and records and internal control over financial reporting." Shortly after,

on August 2, 2023, the Audit Committee of Future FinTech's Board of Directors dismissed Onestop as the company's auditor.

85. On April 21, 2025, Everbright Digital Holding Limited ("EDHL"), a Cayman Islands company headquartered in Hong Kong, completed its initial public offering, offering shares of its common stock at $1.88 per share, which were listed on the Nasdaq. Its stock price began rising quickly in June and early July 2025 before collapsing beginning on July 11, 2025. On July 7, 2025, the stock traded as high as $6.88 per share. Two days later, a Reddit user began a thread entitled "EDHL - about to be pumped (or dumped). Warning!," writing: "Stay away, I got added to a whatsapp group 'Mr Mysterious' that is recommending this to be bought tomorrow and Friday." The next day, the stock traded as high as $6.39 before closing at $5.72 per share. The day after that, it hit $6.29 per share, then closed at $4.30. On July 14, 2025, the next trading day, it closed at $0.91 per share. On September 4, 2025 – the date of FCHL's Prospectuses – EDHL's stock closed at $0.372 per share, and it trades even lower now (before adjusting for a 16:1 reverse stock split).

86. Trading in securities of BUUU Group Ltd.,[9] JBDI Holdings Ltd.,[10] Mercurity Fintech Holding Inc.,[11] MicroAlgo Inc.,[12] Premium Catering (*see supra*, ¶74),[13], SKK (*see supra*,

---

[9] https://www.reddit.com/r/VampireStocks/comments/1n0yc3f/buuu_another_pump_and_dump/

[10] https://x.com/NateHindenburg/status/1835716814564704496

[11] https://x.com/MorpheusRes/status/1920533112338944436

[12] https://www.reddit.com/r/VampireStocks/comments/1d7ugu8/mlgo_is_a_pumpanddump_scam/; https://www.reddit.com/r/pennystocks/comments/1lqd9zr/is_mlgo_about_to_have_a_hype_run/; https://www.reddit.com/r/Shortsqueeze/comments/1kr49cm/mlgo_this_seems_to_pump_and_du mp_on_a_regular/

[13] https://x.com/NateHindenburg/status/1849894395144773835

¶78),[14] Ten-League International Holdings Ltd.,[15] Top Wealth Group Holding Ltd.,[16] and WiMi Hologram Cloud Inc.,[17] each audited by Onestop, have all exhibited the typical characteristics of pump-and-dump schemes.

87. The following companies that Onestop was the auditor for were delisted from the Nasdaq or NYSE: Aesthetic Medical International Holdings Group Ltd.; Blue Hat Interactive Entertainment Technology; Green Giant Inc.; MaxsMaking Inc; Meta Data Limited; Nusatrip Inc.; Society Pass Inc.; and X3 Holdings Co., Ltd. Several other companies received determination letters which informed the companies that they were deficient and would soon be delisted.

88. Onestop's repeated service as an auditor for Asia-based, Nasdaq-listed issuers used as vehicles for market manipulation supports a strong inference that Onestop was negligent in providing a clean opinion on FCHL's financial statements and consenting to the inclusion of that opinion in the Registration Statement.

*3. Cogency Global*

89. Cogency Global served as the U.S. agent for numerous companies involved in Microcap Pump-and-Dump Schemes, including the following:

90. Pheton Holdings Ltd.: a healthcare company incorporated in the Cayman Islands and headquartered in China, which had only eleven employees and $628,591 in yearly revenue when it went public on September 5. 2024, at an IPO price of $4 per share. Pheton's stock price

[14] https://x.com/NateHindenburg/status/1859706375145914403

[15] https://klaymantoskes.com/investigations/webull-financial-security-breach-ten-league-international-holdings-investor-loss-investigation/

[16] https://www.reddit.com/r/VampireStocks/comments/1g1ljli/twg_top_wealth_group_pump_and_dump/

[17] https://www.reddit.com/r/WallStreetbetsELITE/comments/1hnh0zs/wimi_is_a_fake_company_built_for_pump_and_dumps/

skyrocketed to $30.96 on July 28, 2025. In the weeks leading up to that massive increase in price, stock manipulators circulated a Power Point in a WhatsApp group stating that Gilead Sciences was expected to purchase a 30% stake in Pheton, and make a $60-80 million upfront payment to Pheton for licensing radiotherapy technologies. This was false. On July 29, 2025, Pheton's stock price cratered when a popular forensic analysis site, The Bear Cave, published a report explaining how Pheton's stock was manipulated. Pheton's stock price collapsed by around 95% as a result.

91. Cuprina Holdings (Cayman) Ltd.: a Cayman Islands company based in Singapore, whose stock was similarly pumped, peaking on August 14, 2025, before its collapse.

92. Smart Digital Group Limited: a Cayman Islands company with operations in Singapore, Macau, and China, which went public on the Nasdaq in May 2025. The company's stock price was pumped and peaked on September 24, 2025 before the SEC issued a trading suspension on September 26, 2025. At the expiration of the SEC's suspension, Nasdaq halted trading in the stock pending an information request to the company. The stock never resumed trading and has been delisted by Nasdaq.

93. Star Fashion Culture Holdings Limited (CI): a Cayman Islands company based in China that went public on October 11, 2024 and whose stock peaked on August 8, 2025, and then dropped 94%.

94. Reitar Logtech Holdings Limited: a Cayman Islands company based in China, which went public on August 23, 2024 and whose stock price peaked on September 29, 2025, before falling 77%.

95. Pitanium Limited (BVI): a BVI company based in Hong Kong, which went public on May 30, 2025. Trading in the company's stock was suspended on October 6, 2025 after the price peaked five days earlier.

96. China Liberal Education Holdings Ltd. ("CLEU"): as set forth above (*see supra* ¶49), CLEU is a company based in China and incorporated in the Cayman Islands that purported to provide "consulting services . . . to improve campus information and data management systems" and "job readiness training to graduate students." CLEU had gross revenue of only $2.9 million and operated at a net loss of $4.9 million in 2023. CLEU issued tens of millions of shares to accounts controlled by stock manipulators at $0.6 per share. The manipulators impersonated investment advisors, then drove up the price of the stock by disseminating false information on social media, and sold their CLEU holdings at as high as $7.75 a share, reaping hundreds of millions of dollars in profit. On March 20, 2025, the DOJ seized $214 million from the U.S. bank accounts of promoters tied to CLEU.

97. QMMM Holdings Ltd. ("QMMM"): a company headquartered in Hong Kong that went public in July 2024 and offered 40 million new shares in June 2025. The company had 28 employees and around $1.3 million in annual net losses. In August 2025, QMMM's stock price surged by over 100% as a result of the Microcap Pump-and-Dump Scheme. In September, its stock price rose to over $300 from $7 before the SEC suspended trading on September 26, 2025. At the expiration of the SEC's suspension, Nasdaq halted the stock in perpetuity pending an information request. The stock never resumed trading and has been delisted by Nasdaq.

98. EPWK Holdings Ltd.: a China-based company that went public on the Nasdaq on February 6, 2026. The price of EPWK's stock peaked on June 5, 2025, before losing 96% of its value.

99. Overlapping with Bancroft, Cogency Global also serves as the U.S. agent for Dreamland, Premium Catering, Magnitude, Primega, SKK, Hong Kong Pharma and Republic Power.

100. All told, Cogency Global was the U.S. agent for more than ten companies linked to Microcap Pump-and-Dump Schemes.

**F. <u>FCHL Used Gatekeepers with a Known Record of Pump-and-Dump Schemes and Went Public Despite Warning Signs That the Company Was Susceptible to a Microcap Pump-and-Dump Scheme</u>**

101. On December 15, 2023, Fuji Investment, a company incorporated in the BVI and wholly owned by Mr. Chang Kin Man—who also owned Fuji Holdings, an investor in Dreamland (*see supra* ¶72)—entered into an agreement with Defendant Lee to acquire 4.90% of the issued share capital of the then-proposed holding company of Fitness Champs and Fitness Aquatics for US$470,000, implying a valuation of approximately $9.6 million.

102. On February 15, 2024, FCHL was incorporated in the Cayman Islands. One ordinary share was then transferred to Defendant Lee.

103. On May 17, 2024, FCHL filed a draft registration statement with the SEC for an IPO underwritten by Eddid Securities USA Inc.

104. Two months later, on June 19, 2024, Defendant Lee transferred her ordinary share to Big Treasure, her wholly-owned company. That same day, Big Treasure, Easy Builder, Creative Path Holdings Limited ("Creative Path," a BVI company wholly owned by Ms. Lim Shu Qi,), Fuji Investment, Biostar Developments Limited ("Biostar," a BVI company wholly owned by Ms. Yau Ying Ying), and True Height Limited ("True Height," a BVI company wholly owned by Mr. Ee Zhi Chang), subscribed for approximately 64.72%, 19.09%, 4.90%, 4.90%, 4.44% and 1.95%, respectively, of the issued share capital of the Company. As with Fuji Investment, Creative Path's, Biostar's, and True Height's interests in the Company were acquired for cents on the dollar relative to the Company's eventual IPO price and share price during the run-up.

105. Also on June 19, 2024, Big Treasure and Fuji Investment transferred their entire equity interest in Northen Star to FCHL in consideration of FCHL's allotment and issue one share each, credited as fully paid.

106. As a result of these transactions, Big Treasure (and thus Defendant Lee), Easy Builder, Biostar, Creative Path, Fuji Investment, and True Height collectively owned the entire issued share capital of FCHL.

107. On September 9, 2024, FCHL filed a registration statement on Form F-1 for an IPO of 2 million ordinary shares underwritten by Bancroft, including 1.5 million shares offered by FCHL and 500,000 shares offered by certain "Selling Shareholders" (specifically, Big Treasure, True Height, and Fuji Investment), as well as the resale of 2,992,150 ordinary shares held by certain "Resale Shareholders" (i.e., Creative Path, Easy Builder, Biostar, True Height, and Fuji Investment). As described below, this registration statement was later withdrawn, and thus is referred to herein as the "Withdrawn Registration Statement."

108. On March 27, 2025, both FCHL (in a letter signed by Defendant Lee) and Bancroft requested that the SEC accelerate the effective date of the Withdrawn Registration Statement (as amended), such that it become effective on March 31, 2025. Accordingly, the Withdrawn Registration Statement became effective on March 31, 2025 at 4:30 PM Eastern Time.

109. However, FCHL did not consummate any offering pursuant to the Withdrawn Registration Statement.

110. On May 19, 2024, FCHL notified the SEC that it was withdrawing the Withdrawn Registration Statement "because the Company does not intend to pursue the contemplated public offering of the securities covered by the [Withdrawn Registration Statement] at this time." FCHL

"represent[ed] that no securities were sold in connection with the [Withdrawn Registration Statement]."

111. That same day, May 19, 2025, FCHL filed a new registration statement on Form F-1 (the "Registration Statement").

112. On August 29, 2025, both FCHL and Bancroft requested that the SEC accelerate the effective date of the Registration Statement such that it become effective at 4:00 PM Eastern Time on September 3, 2025. As a result of that request, the Registration Statement became effective at 4:00 PM Eastern Time on September 3, 2025.

113. By that time, Microcap Pump-and-Dump Schemes had become rampant.

114. On September 3, 2025, FCHL entered into an underwriting agreement with Bancroft in connection with the IPO.

115. On September 4, 2025, FCHL filed a prospectus on Form 424(b)(4) (the "IPO Prospectus"), which formed part of the Registration Statement, for the sale of 3.75 million ordinary shares, including 2 million shares offered by FCHL and 1.75 million shares to be sold by the "Selling Shareholders," which were Big Treasure, with respect to 1 million shares, and Easy Builder, with respect to 750,000 shares. The total of 3.75 million shares were offered at a price of $4 per share, for a total of $15 million in gross proceeds. FCHL stated that it expected to receive approximately $6.08 million of net proceeds from this offering after deducting underwriting discounts and commissions of $0.56 million and estimated offering expenses of approximately $1.36 million payable by FCHL. FCHL did not receive any proceeds from the sale of shares held by the Selling Shareholders.

116. Also on September 4, 2025, FCHL filed a prospectus on Form 424(b)(5) (the "Resale Prospectus," and together with the IPO Prospectus, the "Prospectuses"), which also

formed part of the Registration Statement, for the sale of 2,113,500 ordinary shares by Easy Builder. The Resale Prospectus stated that any sales of shares pursuant to the Resale Prospectus would take place after the IPO "at prevailing market prices or in privately negotiated prices." FCHL would not receive any proceeds from the sale of shares by Easy Builder pursuant to the Resale Prospectus.

117. Despite its highly misleading statements and omissions, Defendants Lee, Koh, and Teoh signed the Registration Statement, and Defendants Lay, Liu, and Tang each gave consent to being named in the Registration Statement as a director on FCHL's Board.

118. FCHL's ordinary shares began trading on the Nasdaq on September 4, 2025, under the ticker symbol "FCHL," and the IPO closed on September 5, 2025.

119. Prior to the IPO, FCHL had 15 million ordinary shares issued and outstanding. Because FCHL issued and sold 2 million ordinary shares in the IPO, it had 17 million shares issued and outstanding immediately after the IPO.

120. The Prospectuses stated that FCHL had entered into a lock-up agreement with Bancroft providing that, for a period of 180 days from the commencement of sales of FCHL's ordinary shares on the Nasdaq, subject to certain exceptions, FCHL would not sell any ordinary shares, or any securities convertible into or exercisable or exchangeable for ordinary shares, other than in the IPO. Further, each of FCHL's directors and executive officers and 5% or greater shareholders entered into lock-up agreements for the same period, except with respect to those shares to be sold by the Selling Shareholders pursuant to the IPO Prospectus and by Easy Builder pursuant to the Resale Prospectus. Reflecting these lock-up agreements, data from Bloomberg indicates that from September 5, 2025, when FCHL's ordinary shares began trading on the Nasdaq,

through March 2, 2026, the Company's equity float was 3.75 million shares, which is the total number of shares offered pursuant to the IPO Prospectus.

## V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

121. The defective Registration Statement discouraged investors from doing their own due diligence, and instead instructed investors to rely ***only*** on the information provided or incorporated into that document:, stating: "No dealer, salesperson or any other person is authorized to give any information or make any representations in connection with this offering other than those contained in this prospectus and, if given or made, the information or representations must not be relied upon as having been authorized by us."

### A. False and Misleading Statements and Omissions Regarding the Risk of A Pump-and-Dump Scheme

122. The Prospectuses, which formed part of the Registration Statement, stated the following about hypothetical risks related to trading in the Company's ordinary shares:

> ***Certain recent initial public offerings of companies with public floats comparable to our anticipated public float have experienced extreme volatility that was seemingly unrelated to the underlying performance of the respective company. We may experience similar volatility, which may make it difficult for prospective investors to assess the value of our Ordinary Shares***. [Emphasis in original]
>
> . . .
>
> ***Recently, companies with comparable public floats and initial public offering sizes have experienced instances of extreme stock price run-ups followed by rapid price declines, and such stock price volatility was seemingly unrelated to the respective company's underlying performance***. ***Although the specific cause of such volatility is unclear***, our anticipated public float may amplify the impact the actions taken by a few shareholders have on the price of our Ordinary Shares, which may cause our Ordinary Share price to deviate, potentially significantly, from a price that better reflects the underlying performance of our business.

> . . .
>
> *There have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with* ***recent initial public offerings, especially among those with relatively smaller public floats****.* ***As a relatively small-capitalization company with relatively small public float***, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies.
>
> . . .
>
> The trading price of our Ordinary Shares may be volatile and could fluctuate widely ***due to factors beyond our control*** and for reasons that are unrelated to our actual or expected performance.

123. The statements quoted in ¶122, *supra*, were materially false and misleading for several reasons. *First*, the Registration Statement identified the Company's public float and IPO size as characteristics shared by companies whose securities were recently subject to "extreme volatility" without disclosing that FCHL shared several other key characteristics with such companies, including incorporation in the Cayman Islands, dominant insider control, an operating business in Asia, little to no revenues, and choice of auditor, underwriter, and U.S. agent, and thus creating a misleading impression of the risk of such volatility. *Second*, the Registration Statement stated that the securities of other companies that had recently gone public experienced "extreme volatility that was seemingly unrelated to the underlying performance of the respective company," without disclosing that such volatility reflected market manipulation schemes. *Third*, the Registration Statement stated that "the specific cause" of recent volatility in the securities of "companies with comparable public floats and initial public offering sizes" was unclear, without disclosing that such volatility reflected market manipulation schemes. *Fourth*, the Registration Statement stated that "[t]he trading price of our Ordinary Shares may be volatile and could fluctuate widely due to factors beyond our control," without disclosing that the Company had made several choices within its control—including its IPO size, public float, incorporation in the

Cayman Islands, dominant insider control, an operating business in Asia, little to no revenues, and choice of auditor, underwriter, and U.S. agent—that created a heightened risk of volatility arising from a market manipulation scheme.

124. Furthermore, the statements quoted in ¶122, *supra*, were materially false and misleading because they failed to disclose that: (1) FCHL shared several key characteristics, including a low public float, insider control, incorporation in the Cayman Islands, an operating business in Asia, and little to no revenues, with numerous other companies whose securities had, at the time of the statements, recently been subject to a market manipulation scheme that injured investors; (2) the sole underwriter on the IPO, Bancroft, had conducted numerous microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; (3) the Company's auditor was also the auditor for numerous other microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; (4) the Company's U.S. agent was also the U.S. agent for numerous other microcap IPOs that suffered volatility-induced declines resulting from market manipulation schemes; and (5) as a result, FCHL securities were at unique risk of a severe volatility-induced decline caused by a market manipulation scheme.

125. In addition, Item 105 of SEC Regulation S-K required Defendants to describe, in the Registration Statement, ***all*** material factors that made an investment in FCHL risky or speculative. 17 C.F.R. § 229.105. Item 105 discourages boilerplate or generic risk disclosures like the materially misleading statements contained in the Registration Statement. 17 C.F.R. § 229.105(a).

126. Instead, the discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks like the misleading disclosures

in the Registration Statement cannot shield Defendants from liability, and could not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

127. Further, Item 303 required the Registration Statement to disclose material trends or uncertainties reasonably likely to impact FCHL's liquidity, capital resources, and results of operations or financial condition. 17 C.F.R. § 229.303(b)(1)-(2).

128. Item 3 of Form F-1 requires issuers to "[f]urnish the information required by Item 105 . . . of Regulation S-K."[18] Further, "the SEC has stated that its interpretations of Item 303 apply to Management Discussion & Analysis [MD & A] disclosures drafted pursuant to Item 5 of Form 20-F [that applies] to foreign corporations." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021); *see also Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022) (finding that foreign companies are required to comply with Item 303 of Regulation S-K).

129. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion

[18] SEC, *Form F-1*, at 6, https://www.sec.gov/files/formf-1.pdf.

and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

130. Under Item 303, even if a defendant cannot determine whether an uncertainty will occur, disclosure is still required unless the defendant affirmatively determines that no material effect is reasonably likely.

131. Put simply, Items 105 and 303 required Defendants to disclose that FCHL was highly likely to be the subject of a Microcap Pump-and-Dump Scheme, and prohibited the Defendants from relying on generic risk warnings that could apply to virtually any "relatively small-capitalization company with relatively small public float," as the Registration Statement stated.

132. Defendants failed to comply with Regulation S-K's rigorous disclosure requirements by failing to disclose: (a) the known adverse trend that by the time FCHL went public, numerous companies that shared key characteristics with FCHL had seen extreme volatility in the price of their securities as a result of market manipulation schemes; (b) the heightened risk that FCHL was likely to be manipulated by a market manipulation scheme, damaging investors; and (c) the known fact that FCHL used gatekeepers for its IPO—i.e., its underwriter, auditor, and U.S. agent—with a history of facilitating such schemes.

### B. <u>False and Misleading Statements and Omissions Regarding the Company's Business and Operations</u>

133. In addition, the Registration Statement contained false and misleading statements and omissions regarding FCHL's business and operations.

134. *First*, the Registration Statement made numerous statements touting the Company's place in the swimming lesson market in Singapore. For instance, the Registration Statement further stated that: "We rely on our 'Fitness Champs' brand and ***our reputation as a leading provider of***

***comprehensive swimming lessons services*** and our inability to maintain this brand strength and reputation could affect our operating results and business."

135. The Registration Statement further stated that: (1) "[W]e are one of five schools/institutions registered with Sport Singapore and the MOE that can provide courses under the MOE's SwimSafer program;" and (2) "We are one of five swimming schools who are engaged by the MOE to provide swimming lessons to students who are enrolled in public schools in Singapore under the SwimSafer initiative spearheaded by the Singapore Government."

136. The SwimSafer program is, as stated in the Registration Statement, "a mandatory national program in Singapore for primary school students under the Sport Singapore dedicated to promoting safety and education to public about the importance of water safety and to raise the standard of swimming proficiency in Singapore." (Sport Singapore is a "[s]porting advocacy program under Singapore's Ministry of Culture, Community & Culture.") SwimSafer was developed by Singapore's National Water Safety Council in collaboration with Sport Singapore in 2010. In 2018, the program was enhanced and renamed SwimSafer 2.0. (For ease of reference, and because the relevant period for this Complaint begins after 2018, this Complaint uses the term "SwimSafer" to encompass SwimSafer 2.0.)

137. The SwimSafer program consists of six progressive stages, with each stage consisting of two components that must be completed to be considered as cleared/competent for the respective stage: (1) a practical assessment; and (2) an online theory quiz. Each stage involves reaching certain milestones. Singapore's Ministry of Education Requires primary schools to offer swimming programs using SwimSafer, and primary school students must participate unless medically exempted.

138. However, these statements were materially false and misleading because they misrepresented the Company's competitive position in Singapore's swim coaching industry. Lead Counsel's investigation revealed myriad facts establishing that the Registration Statement misled investors.

139. The SwimSafer Centralised Assessment Management System (CAMS) Handbook, published by Sport Singapore and Singapore Aquatics (which, per its website, is Singapore's National Sports Association governing Swimming, Water Polo, Artistic Swimming, Diving and Open Water Swimming in Singapore), states that there are five centralized assessment centers: (1) Bukit Batok Swimming Complex; (2) Yishun Swimming Complex; (3) Yio Chu Kang Swimming Complex; (4) Heartbeat@Bedok Swimming Complex; and (5) Jalan Besar Swimming Complex. While the CAMS Handbook allows that "[a]ssessments at non-Active SG pool facilities may be permitted, provided that the facility is an affiliated member of SAQ [Singapore Aquatics] or affiliated with another government organisation, and have the necessary pool specifications," such applications must be submitted at least two months in advance and are only reviewed and approved on a case-by-case basis. Further, Sport Singapore's ActiveSG website, which is a Singapore government agency website, states that "[a]ll SwimSafer CAMS are conducted at *these 5* ActiveSG pools," referring to the above-listed swimming complexes.

140. On FCHL's website, the drop-down menu appearing at the top right identifies four locations: (1) Bukit Canberra Swimming Complex; (2) Clementi Swimming Complex; (3) Delta Swimming Complex; and (4) Sengkang Swimming Complex. This is shown in the screenshot below (the locations have been outlined in red for ease of reference):




141. None of these are among the five ActiveSG pools at which, according to Sport Singapore, all SwimSafer CAMS are conducted. This information suggests that FCHL is not, in fact, "one of the largest providers of swimming lessons to children enrolled in public schools under the MOE in Singapore through the SwimSafer program."

142. In addition, searches on Google Maps, which is commonly used in Singapore, indicate that FCHL is not a leading provider of swim lessons. Searches on Google Maps for "Fitness Champs" and "Fitness Champs" yield only a single result, called "Fitness Champs Aquatics - Beginner Swim Lessons In Singapore," listed at the location of FCHL's 1,036 square foot headquarters. As of September 4, 2026, there were sixty-seven reviews of the Company (with an average rating of 4 stars out of 5).

143. By contrast, Google Maps searches for "swim lessons" in Singapore yield numerous swim schools with hundreds more reviews, including: (i) SwimRay Swimming Lessons, with 1,184 reviews (with a 4.9-star average rating), and whose website states that it prepares children to pass SwimSafer tests; (ii) SG Sink or Swim School, with 112 reviews (with a 5-star average rating), and which advertises its "SwimSafer Academy;" (iii) Penguin Swim School (with

a 5-star average rating), which also touts its SwimSafer lessons; (iv) Singapore Swimming Academy, with ninety-seven reviews (and a 4.7 star average rating), which advertises "certified SwimSafer programmes;" (v) Ace Dolphin Swim School, with eighty-three reviews (and a 4.9-star average rating), which represents that it offers SwimSafer lessons; (vi) Swim.Thea, with 108 reviews (and a 5-star average rating); (vii) Friendly Dolphin Swim School, with 297 reviews (and a 4.8-star average rating), which advertises children's swimming lessons that adhere to the SwimSafer curriculum; (viii) Swim Masters Singapore, with 222 reviews (and a 4.9-star average rating), and which also offers SwimSafer lessons; (ix) Little Splashes Aquatics, with 147 reviews (and a 4.8-star average rating), which states that it offers a "SwimSafer programme" and certified SwimSafer instructors; (x) Isplash Swim School, with 118 reviews (and a 4.9-star average rating), which advertises that "[e]very lesson is built around the national SwimSafer 2.0 syllabus;" (xi) Training 360 Swim School, with 263 reviews (and a 5-star average rating), which represents that it offers lessons led by NROC-certified coaches to help children "progress though recognized programmes such as SwimSafer;" (xii) SmileSwimmers, with 141 reviews (and a 4.9-star average rating), which also advertises a SwimSafer program; (xiii) SwimCareSG, with 121 reviews (and a 4.9-star average rating), and claims to provide a SwimSafer program; (xiv) Happy Fish Swim School, which appears twice (with two locations), one with 508 reviews (and a 4.9-star average rating), and the other with 347 reviews (and a 4.8-star average rating), and which invites prospective customers to "Learn SwimSafer with Happy Fish;" (xv) JustSwim swim school, with 308 reviews (and a 4.8-star average rating), which also represents that it offers a SwimSafer program; and (xvi) The Swimming Room, with 114 reviews (and a 4.9-star average rating), which advertises that children who complete its courses will be eligible to test SwimSafer tests to advance

to the next stage of SwimSafer. This is far from an exhaustive list; there are many other swim schools in Singapore that advertise SwimSafer lessons and have far more user reviews than FCHL.

144. Consistent with these facts, multiple swimming coaches in Singapore reported their understanding that at least *thirty* swimming schools are able to offer swimming lessons to students enrolled in Singapore public schools under the SwimSafer initiative.

145. Therefore, the Registration Statement's statement that FCHL has a "reputation as ***a leading provider of comprehensive swimming lessons services***," which conveyed to investors that (1) FCHL has such a reputation, and (2) is in fact a "leading provider of comprehensive swimming lessons services," is materially false and misleading. There are many other swim schools in Singapore that have a better reputation (reflected by more user reviews and a higher average rating) and have greater market share.

146. In addition, the Registration Statement's statements that FCHL is one of only five swimming schools that can provide swimming lessons to public school students under the SwimSafer initiative is materially false and misleading because many other swim schools in Singapore offer SwimSafer lessons to students. Indeed, according to multiple swimming coaches in Singapore, at least *thirty* swimming schools are able to offer swimming lessons to students enrolled in Singapore public schools under the SwimSafer initiative.

147. *Second*, the Registration Statement stated that "[a]s of December 2024, we have certified a total of over 170,000 students through the SwimSafer Program." In the Registration Statement, "we" refers to FCHL. However, FCHL's website states that "[t]o date, we have successfully completed 990 swimsafer swimming school projects and ***a total of more than 170,000 students have been certified by our coaches through the Swimsafer Swimming Programme***." Thus, *FCHL* has not "certified a total of over 170,000 students through the SwimSafer program."

Rather, "our coaches," meaning coaches that FCHL hires, have certified "over 170,000 students through the SwimSafer program." This is materially different. FCHL hires coaches as independent contractors, or freelancers, and thus those coaches may offer lessons—and certify students—while working for other swim schools (such as the many other schools that, based on Google Maps searches, have greater market share than FCHL).

148. Indeed, Lead Counsel's investigation, which included discussions by Lead Counsel's investigator with multiple swim coaches in Singapore, confirmed the materiality of this difference. For instance, one private swimming coach with more than fifteen years' experience explained that the majority of swim coaches are freelancers and independent operators. Another coach, employed by a competitor to FCHL, explained that many of that school's coaches are freelancers who work with multiple swimming schools. Thus, the "170,000 students" that the Registration Statement stated that FCHL certified in the SwimSafer programme includes students that coaches employed by FCHL have certified while working for competing schools. Thus, the Registration Statement misleadingly represented the success of FCHL's business.

149. *Third*, the Registration Statement stated that Defendant Lee, the Company's founder, Executive Director, and CEO, "has been a swim coach for more than 26 years since 1999 and is registered with the NROC," or the National Registry of Coaches. As stated in the Registration Statement, "[t]he NROC is a database of coaches who are recognized by the Singapore government to be certified and competent in coaching." NROC certification is key because over 40% of the Company's revenues in 2023 and 2024 were from the government sector. Accordingly, the Registration Statement stated that the Company requires all of its swim coaches "to fulfil the requirements needed to maintain a valid basic first-aid certification and registration with the NROC on an ongoing basis."

150. This was false, however, as Defendant Lee is not listed among the coaches in the public NROC database. Defendant Lee was not among the results in searches for "Joyce," "Lee," "Li," "Jue," "Hui," or "Juehui" in that database. The Registration Statement's misrepresentation that Defendant Lee is registered with the NROC (which was stated twice in the Registration Statement, underscoring its importance) was material in light of the amount of revenue from the government sector.[19]

151. *Fourth*, the Registration Statement misled investors regarding the fees the Company pays to its swim coaches. According to the Registration Statement, the Company delivers its swim coaching services via swim coaches, who are independent contractors. The Prospectuses both stated that FCHL had "more than 240 certified swim coaches as of the date of this prospectus," and acknowledged that "we rely on our coaching team, in particular our contracted coaches to develop and provide courses." The fees that the Company pays to its contracted coaches are one of the Company's most significant costs of revenue.

152. The Registration Statement reported that the Company's cost of revenue for the year ended December 31, 2024, was $2.694 million, 1.3% higher than the prior year "mainly due to an increase in coaches' fees and cost of merchandise," and explained that "[c]oaches' fees increased by approximately S$8,000, or 0.3% to approximately S$2.317 million (US$1.702 million) compared to S$2.309 million for the year ended December 31, 2023." The Registration Statement explained that "[t]he increase was as a result of efforts to introduce more classes to the students and hence, we increased class offerings that necessitated higher coaches' fees." Further,

[19] Though the NROC database does not show registered coaches who have chosen not to publish their profiles, given the fact that the Company repeatedly stated in the Registration Statement and elsewhere that Defendant Lee was "registered with the NROC" (which is stated in many of the Company's SEC filings), the most plausible inference to be drawn from Defendant Lee's absence from NROC search results is that she is not registered with the NROC.

the Registration Statement disclosed that "[t]he decline in the Company's gross profit margin from 42.8% for the year ended December 31, 2023 to 36.1% for the year ended December 31, 2024 can be attributed to an increase in coaches' fees, which resulted in lower profit margins." Thus, this line item is key to the Company's profitability.

153. Despite the materiality of coaches' fees, the Prospectuses, where were filed on September 4, 2025, did not disclose that the Company began paying its coaches a higher hourly rate on January 1, 2025, *eight months earlier*. This information was not disclosed to investors until December 29, 2025, when the Company filed financial information for the six months ended June 30, 2025, and May 15, 2026—months after the Class Period—when the Company filed the 2025 20-F.

154. On December 29, 2025, the Company filed: (1) a press release entitled "Fitness Champs Holdings Limited Reports Unaudited Financial Results for the First Six Months of Fiscal Year 2025" (the "June 30, 2025 Financial Results Press Release"); (2) Management's Discussion and Analysis of Financial Condition and Results for the Six Months ended June 30, 2025 (the "June 30, 2025 MD&A"); and (3) Unaudited Interim Condensed Financial Statements for the Six Months Ended June 30, 2025 (the "June 30, 2025 Financial Statements").

155. These filings revealed that the Company's cost of revenues had materially increased, driving a material decline in gross profit. The Company's cost of revenue for the six months ended June 30, 2025 was approximately $1.54 million, a year-over-year increase of 6.1%, which "was primarily attributable to the revision of coaches' fees effective January 1, 2025, which resulted in higher compensation costs when compared to the prior-year period." Further, gross profits for the six months ended June 30, 2025 were $0.62 million, a 20% year-over-over decline, and gross profit margin was approximately 28.8%, a 17% year-over-year decline. The filings

acknowledged that "[t]he decrease in gross profit was primarily attributable to higher cost of services, which increased from approximately $1.45 million to $1.54 million, mainly due to the revision of coaches' hourly rates." This increase in coaches' fees occurred despite the fact that the Company had lower enrollment, year-over-year, for the six months ended June 30, 2025.

156. As a result of the increased coaches' fees, FCHL went from profitable, in both the six months ended June 30, 2024 and the fiscal year ended December 31, 2024—when it had net income of S$172,000, as reported in the Registration Statement—to incurring a net loss of S$248,000 in the six months ended June 30, 2025.

157. The 2025 20-F, filed after the Class Period on May 15, 2026, provided more information on how the increase in coaches' fees negatively impacted the Company's financials. The 2025 20-F reported that the Company's cost of revenues for 2025 increased 12% year-over-year "mainly due to an increase in coaches' fees," and that coaches' fees increased "approximately S$322,000, or 13.9%, to approximately S$2.638 million (US$2.056 million)" primarily due to "higher hourly rates paid to coaches." The 2025 20-F disclosed that the increase in coaches' fees drove a decline in Company's gross profit margin from 36.1% in 2024 to 27.3% in 2025—more than *24.3%*. Further, the Company incurred a net loss of S$1.365 million for the year ended December 31, 2025.

158. Despite the material adverse impact the increased fees—which began January 1, 2025—were having on the Company's financial condition, the increase was not disclosed in the Prospectuses or elsewhere in the Registration Statement. This omission rendered the Registration Statement misleading and was required to be disclosed under SEC Regulation S-K.

159. The Registration Statement contained several statements that were materially misleading by virtue of the omission of the increase in coaches' fees. The Registration Statement

stated that "[e]xpansion and retention of a strong coaching staff *may* necessitate the provision of training opportunities and high salaries," even though the Company had *already*, eight months prior, increased the fees it paid to coaches. (Though FCHL's coaches are independent contractors, at times it referred to the fees paid to coaches as "salaries." For instance, the June 30, 2025 MD&A stated that "our cost of revenue mainly comprises coaches' fees (*including salaries* and benefits)," among other items, and that the increase in G&A expenses for the six months ended June 30, 2025 was "primarily driven by higher employee compensation, which rose by approximately $0.20 million, or 45.8%, due to the salary revision effective January 1, 2025," referring to the increase in coaches' hourly rates.)

160. Further, in Note 18 to the Consolidated Financial Statements in each of the Prospectuses, the Company was required, under Accounting Standards Codification 855 (a rule that forms part of Generally Accepted Accounting Principles, or "GAAP"), to disclose events that occur after the balance sheet date but before consolidated financial statements are issued. Here, the Company's financial statements for the year ended December 31, 2024 were issued on May 14, 2025, the date the Company filed the 2024 20-F.

161. Accordingly, the Registration Statement stated that "the Company has evaluated all events or transactions that occurred after December 31, 2024, up through the date the Company issued the consolidated financial statements," and included a disclosure that purported to "present[] subsequent events occurring after the reporting period ended December 31, 2024[.]"

162. That disclosure did not inform investors that the Company had begun paying its coaches a higher hourly rate beginning on January 1, 2025, or that this increase was likely to materially increase the Company's cost of revenue and G&A expenses, and drive a decline in the Company's gross profit margin, and thus was materially misleading.

163. In addition to these affirmative false and misleading statements, the Registration Statement's failure to disclose this information constituted independently actionable omissions of known, material uncertainties and trends and material risks in violation of Item 303 and Item 105 of SEC Regulation S-K.

164. The omitted information regarding the materially increased coaches' fees paid by the Company beginning on January 1, 2025, driving up the Company's cost of revenue and G&A expenses, and driving a decline in the Company's gross profit margin, constituted information that made an investment in FCHL risky or speculative, and thus its omission violated Item 105. In addition, the increased coaches' fees constituted a material trend or event reasonably likely to impact the Company's results of operations or financial condition, and thus its omission violated Item 303.

## VI. <u>THE TRUTH BEGINS TO EMERGE</u>

165. Within a matter of days of FCHL's IPO, and with no other news or announcements to support it, the price of the Company's ordinary shares quickly climbed on a significant surge in trading volume. By September 11, 2025, the stock reached a price of $5.24 on trading volume of 8 million shares—up from around 3 million at the IPO.

166. This upward trajectory continued: the stock reached a Class Period high of $7.64 per share intraday and closing price of $7.20 on September 19, 2025, on trading volume of 13 million shares and a float-turnover ratio of 3.47, signifying extremely high volatility. That day, trading in the stock was halted by Nasdaq on a Limit Up-Limit Down Trading Pause.

167. The ordinary share price closed at $6.95 on September 22, 2025—the next trading day—on high trading volume of over 6.4 million shares and a float turnover ratio of 1.72, signifying extreme volatility.

168. Despite these unusual developments, Defendants were silent.

169. Although public filings and news were scarce regarding the Company even as both stock price and trading volume surged, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" FCHL led by stock promoters posing as financial advisors. Based on information and belief, these stock promoters used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding FCHL.

170. These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join a stock trading and tips "groups" on messaging applications. One such group was marketed as the "Diamond Investment Club" and marketed as a free investment guidance group powered by AI and advised by a "Professor Davis," as seen from the following WhatsApp transcript:

> 8/25, 9:45:39 PM] +13032176441 : This is what a friend should do.
>
> [19/8/25, 9:52:30 PM] +13032176441 : Tomorrow or Thursday, our team's founder, Professor Davis, will personally create a trading plan, targeting a 15–25% return within 5–10 trading days. Dear Madam, would
>
> you be interested? I estimate the probability of success is around 90%. I suggest you give it some consideration.
>
> [19/8/25, 10:16:30 PM] J: My money is tied up with other stocks for long term investment. i hv no more margin to invest since i m holding on to Coin and MP <This message was edited>
>
> [20/8/25, 8:55:00 PM] +13032176441 : Good morning, my dear lady. Yesterday truly left me exhausted.
>
> [20/8/25, 8:59:03 PM] J: Hi Daniel
>
> [20/8/25, 9:00:47 PM] J: Are we expecting more bad news?
>
> [20/8/25, 9:02:29 PM] J: <attached: 00000122-PHOTO-2025-08-20-21-02-29.jpg>
>
> [20/8/25, 9:03:00 PM] J: So we hv to sell Coin at a loss if it drops to $295?

> [20/8/25, 9:03:59 PM] J: What's your role vs Sophia's? How is this Diamond Investment club free for members?
>
> [20/8/25, 9:14:30 PM] +13032176441 : My dear lady, you don't need to worry. I've already developed a corresponding strategy regarding COIN. As for Sophia, she is my assistant.
>
> [20/8/25, 9:15:59 PM] J: I see.. so what is the strategy? :)
>
> [20/8/25, 9:17:54 PM] +13032176441 : Our team, the Diamond Club partners, has developed an AI-powered stock selection and trading system. It is currently in the testing phase, and we are recruiting free trial users to validate its performance in real trading and to help improve the system with real market data. In the next stage, the system will be launched as a paid app, available to the public

171. Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. The promoter would also require the investor to send them screenshots of the trade when completed. For example, these messages from stock promoters included and were similar to the following transcript:

Investment Thesis

> *Market Dominance: FCHL controls nearly 55% of the Singapore* swimming education industry and is the undisputed market leader.
>
> ***Monopoly Advantage: With such a high market share, FCHL enjoys near-monopoly pricing power, strong profitability, and minimal competitive pressure.***
>
> Institutional Support: This IPO was led by several of Singapore's five largest financial institutions. The strong support from these institutions not only validates FCHL's value but also strengthens confidence in its post-IPO capital inflow.
>
> [9/9/25, 9:03:12 PM] +13032176441 : Set the limit order at $4.43.
>
> [9/9/25, 9:04:35 PM] J: They just ipo?
>
> [9/9/25, 9:04:53 PM] J: Wah Singapore! <This message was edited>

[9/9/25, 9:07:19 PM] +13032176441 : Yes, dear lady, the company is from your hometown.

[9/9/25, 9:09:54 PM] J: ***So I shd use up all available funds for this trade right?***

[9/9/25, 9:11:56 PM] +13032176441 : ***Yes, dear lady. To aim for higher profits, you can go all-in.***

[9/9/25, 9:14:58 PM] J: <attached: 00000420-PHOTO-2025-09-09-21-14-58.jpg>

[9/9/25, 9:22:16 PM] +13032176441 : Alright, dear lady. The purchase was successful. Please provide me with a screenshot of the trade details I need it to track the trade in real time.

[9/9/25, 9:23:14 PM] J: Once it's done I will send to u

[9/9/25, 9:25:51 PM] J: Can u elaborate more on the trading strategy?" collaborative quantitative strategy and substantial institutional capital inflows"

[9/9/25, 10:32:16 PM] J: So far the buy is not secured yet

[9/9/25, 10:35:48 PM] +13032176441 : Just be patient, dear lady.

9/9/25, 10:38:51 PM] +13032176441 : Actually, there's nothing particularly mysterious about this trade. ***We received a project from the Singapore government, which is helping the local company FCHL list in the U.S. market. Regardless, it's still a foreign enterprise if you want to go public in the U.S., you need cooperation from local institutions to facilitate many aspects of the listing. Conveniently, the institution we're currently collaborating with is a partner in this project, which gave us a portion of the allocation to help drive this trade.*** So, it's not as mysterious as it might seem it's essentially a foreign company listing in the U.S., and the local institution's involvement helps generate market interest post-listing.

[9/9/25, 11:54:15 PM] +13032176441 : Dear lady, the buying pressure in the market is strong today, but there's no need to rush. Even if the price doesn't drop again today and your order isn't filled, I'll secure the lowest entry price for you tomorrow. Please don't chase the highs. We will responsibly guide you to buy at the lows and sell at the highs to maximize your profits. Stay patient and keep in touch with me at all times while awaiting further instructions.

172. As FCHL's stock price began reaching its zenith in late September, stock promoters again pushed the stock:

> Ticker Symbol: FCHL
>
> Buy-in Price: $6.63 (please place your order at the specified price; this is essentially today's intraday low)
>
> Per-Member Target: $50K–$80K Expected Gain: 40%–50%
>
> Target Sell Price: To be announced
>
> This trade doesn't need much introduction, as we've traded this stock before, and some members have already profited from it. The reasons for buying were explained previously: with the rate cut now in place, rate-cut beneficiary stocks are leading the market, and this one is entering a second strong upward wave after its adjustment. Whether it surpasses our expectations will depend on the duration and strength of the current rate-cut cycle.
>
> Here are two key reminders:
>
> ***Please place your orders strictly at the specified price. This is the intraday low we've secured for you.*** If we give you this price, don't worry about not being able to buy in — just follow the strategy.
>
> ***Please avoid disclosing this trade to anyone outside our group.*** Keep it as confidential as possible so the trade can proceed smoothly.
>
> [19/9/25, 8:45:55 PM] J: For FCHL somehow my max purchase margin is lower than for other stocks
>
> [19/9/25, 8:48:55 PM] +13032176441 : This is because your other stocks are already occupying your
>
> positions, so you cannot use too much margin for additional purchases, dear Madam.
>
> [19/9/25, 8:49:36 PM] J: No, when I look at other stocks to buy, the margin limit was higher ..
>
> [19/9/25, 8:50:28 PM] J: Strange
>
> [19/9/25, 8:55:21 PM] J: <attached: 00000620-PHOTO-2025-09-19-20-55-20.jpg>

[19/9/25, 8:57:24 PM] +13032176441 : Alright, dear Madam, is this a purchase without using margin?

[19/9/25, 8:58:40 PM] J: This is with margin..

[19/9/25, 9:00:37 PM] +13032176441 : Alright, dear Madam.

[19/9/25, 9:09:57 PM] J: Do other traders buy with margin too?

[19/9/25, 9:11:01 PM] +13032176441 : Yes, basically every investor uses margin.

[19/9/25, 9:11:33 PM] J: I mean it's a bigger risk to buy penny stocks with margin

[19/9/25, 9:16:00 PM] +13032176441 : You're right, buying low-priced stocks on margin carries higher risk.

Therefore, our team closely monitors positions, implements strict risk controls to minimize potential losses, sets clear entry and exit points, and ensures that each trade aligns with our overall risk management strategy.

[19/9/25, 9:20:37 PM] J: Are you also investing a big amount in this trade? :)

[19/9/25, 9:21:56 PM] +13032176441 : Yes, for every trading plan we implement, our team participates with a significant amount of capital.

[19/9/25, 9:30:45 PM] J: Why did we choose this stock again and not other stocks we traded before?

[19/9/25, 9:43:58 PM] +13032176441 : ***Currently, our team believes this stock has great potential, especially since it is backed by the Singaporean government.***

[19/9/25, 10:45:12 PM] J: The stock just went up to $7.64, hv we missed the entry point?

[19/9/25, 10:47:48 PM] +13032176441 : Our team will make sure to find the best entry point to help everyone achieve higher profits. Please keep your order at $6.63, my friend.

[19/9/25, 10:49:13 PM] J: Ok

173. On September 23, 2025, the Company opened for trading at $7.35 per share and within minutes, a surge of sell orders starting at 10:04 AM EST, caused the stock to plummet from a trading of $7.20 to $6.02 per share by 10:07:50 AM EST on trading volume of 462,843, nearly one quarter of the total public float. The extreme volume and price activity triggered a halt in trading by Nasdaq between 10:07:50 AM EST and 10:22:50 AM EST.

174. When the Company's stock resumed trading at 10:22:50 AM EST, its stock price had declined to $4.64 per share, a drop of 35.6% in a matter of minutes despite no news or information regarding the Company. FCHL stock traded for approximately two minutes before it was halted again between approximately 10:24 AM EST and 10:49 AM EST.

175. When FCHL resumed trading at 10:49 AM EST, the resumption lasted just one minute with FCHL stock being traded 170,530 times with the stock price declining another $1.22 per share, down to $3.42 per share.

176. Trading in FCHL stock was then halted again for approximately a half-hour and resumed trading at 11:29 AM EST and was available to be traded for approximately two minutes between 11:29 AM EST and 11:31 AM EST. Upon the resumption of trading at 11:29 AM EST, the Company's stock price declined to $1.80 per share, a drop of $5.55 per share or 75.5% from open. During this brief window, the Company's trading volume was 179,681.

177. When FCHL resumed trading at 11:40 AM EST, the stock opened at $1.47 per share. However, the Company's stock would remain open for trading only until approximately 11:51 AM EST, when another halt for Limit-Up Limit Down Trading Pause after the stock was traded in excess of 2.5 million times in a matter of ten minutes.

178. Finally, following another brief, final halt, FCHL stock resumed trading at approximately 11:55 AM EST and continued to trade through the remainder of the day, closing at

$1.10 per share, a single-day decline of 84.1% on total trading volume of 19,268,300, a float-turnover ratio of 5.13.

179. Accordingly, the Company's market capitalization has suffered significantly. At closing on the date of its IPO, FCHL's market capitalization was $72.25 million. At present, the Company's market capitalization is approximately $1.3 million, a collapse of over 98%.

180. Through the 84.1% single-day decline, numerous halts in trading of the stock and the accompanying trading volume, the truth was revealed that FCHL was used as a vehicle for a market manipulation scheme designed to "pump-and-dump" the common stock with investors suffering extreme losses.

## VII. AUDITOR DEFENDANT ALLEGATIONS

181. The Auditor Defendant certified in the Prospectuses and as part of the Registration Statement that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the company as of December 31, 2024 and 2023 and the results of its operations and cash for each of years ended December 31, 2024 and 2023, in conformity with the account principles generally accepted in the United States of America ('U.S. GAAP')." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

182. In issuing its audit opinion on FCHL's financial statements, the Auditor Defendant failed to comply with U.S. GAAP or PCAOB requirements. These standards required the Auditor Defendant to exercise due professional care in the performance of the audit and to obtain

competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.

183. In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review FCHL's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements. Accordingly, the Auditor Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

## VIII. POST-CLASS PERIOD EVENTS

184. On November 6, 2025, FCHL received a letter from the Listing Qualifications staff of Nasdaq notifying the Company that based on the closing bid price of the Company for the period from September 24, 2025 to November 5, 2025, the Company no longer meets the continued listing requirement of the Nasdaq Listing Rules 5550(a)(2), to maintain a minimum bid price of $1 per share. Pursuant to the Nasdaq Listing Rules, FCHL had a 180-day period, or until May 5, 2026, to regain compliance.

185. On December 31, 2025, FCHL announced that it would hold an Extraordinary General Meeting of Shareholders (the "EGM") on January 23, 2026, at 10 AM (Singapore Time) (or 9 PM EST), at its 1,036 square feet headquarters in Singapore, regarding two resolutions: (1)

to redesignate and reclassify FCHL's ordinary shares such that Defendant Lee's 8,707,850 ordinary shares would be reclassified as Class B ordinary shares, each with 50 votes per share, while the ordinary shares of all other shareholders would be reclassified as Class A ordinary shares, with one vote per share, and the Company would also issue preferred shares; and (2) to conduct a reverse stock split by consolidating the Company's issued and unissued shares, of whatever classes and series, at a ratio of between 2:1 and 50:1, with the exact ratio to be determined by the Board within 180 calendar days after passage of the resolution. On January 27, 2026, FCHL announced that holders of 5,666,667 ordinary shares as of the record date of December 30, 2025 were present in person or by proxy, and that the resolutions both passed with over 94% of shares present voting in favor.

186. On February 27, 2026, FCHL announced another EGM, to be held on March 20, 2026, again at the Company's Singapore headquarters, for the purpose of considering a resolution for another reverse stock split at a ratio of between 20:1 and 250:1, the exact ratio to be determined by the Board within 180 calendar days.

187. On March 18, 2026, FCHL announced that on February 12, 2026, its Board approved the consolidation of FCHL's stock in a reverse split, at a 15:1 ratio, effective March 23, 2026, which thereafter occurred.

188. On March 23, 2026, FCHL announced that at the March 20, 2026 EGM, holders of 90,067 Class A Ordinary Shares and 580,524 Class B Ordinary Shares were present in person or by proxy, and approved the resolution.

189. On April 30, 2026, FCHL announced that on March 24, 2026, its Board approved the consolidation of FCHL's stock in a reverse split at a 30:1 ratio, effective May 4, 2026, which thereafter occurred.

190. On May 26, 2026, FCHL received another deficiency notice from the Nasdaq indicating that it was not in compliance with Nasdaq Listing Rule 5550(b)(1) because its stockholders' equity of $598,490 as of December 31, 2025, was below the minimum of $2.5 million and the Company did not meet the alternative standards of (1) market value of listed securities or (2) net income from continuing operations. FCHL also stated in that announcement that it believed it was now in compliance with Nasdaq Listing Rule 5550(b)(1), though that determination was in the hands in Nasdaq.

191. On June 10, 2026, FCHL announced yet another EGM, to be held on June 29, 2026, for the purpose of considering a resolution to increase the Company's authorized share capital and consolidate the Company's stock once again at a ratio of between 2:1 and 500:1.

192. On June 30, 2026, FCHL announced that the resolution considered on June 29, 2026, was approved, with 98% of votes in favor. FCHL has not yet announced a reverse stock split pursuant to that approved resolution.

193. Thus, the Company's stock has already been consolidated at a ratio of 450:1 since the end of the Class Period, and will likely be consolidated further, at a ratio of up to 500:1.

## IX. <u>ADDITIONAL ALLEGATIONS APPLICABLE ONLY TO THE EXCHANGE ACT CLAIMS</u>

194. Plaintiffs make the additional allegations contained in ¶¶195-205 below with respect to their fraud claims brought under Sections 10(b) and 20(a) of the Exchange Act only. Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in their Securities Act claims (Counts I and II).

195. FCHL and the Individual Defendants are makers of the statements contained in the Registration Statement because: FCHL is the issuer of the statements; Lee, Koh, and Teoh signed

the Registration Statement; and Lay, Liu, and Tang gave their consent to be named in the Registration Statement as directors of the Company.

196. The Individual Defendants possessed the power and authority to control the contents of FCHL's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of FCHL's SEC filings, press releases, and other market communications alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions at FCHL, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

### A. The Gatekeeper Defendants Knew or Recklessly Disregarded the Risk That FCHL Would Be the Subject of Fraud

197. Since at least 2024, Bancroft, Onestop, and Cogency Global have enabled Microcap Pump-and-Dump Schemes on numerous occasions.

198. As discussed in ¶¶71-81 and 83-102, *supra*, before FCHL went public, each of the Gatekeeper Defendants participated in the IPOs of multiple companies involved in Microcap Pump-and-Dump Schemes. Bancroft was involved in Microcap Pump-and-Dump Schemes at least eleven times, Cogency Global was involved in Microcap Pump-and-Dump Schemes at least nine times, and Onestop was involved in Microcap Pump-and-Dump Schemes at least eighteen times.

199. On or before FCHL's IPO, the Gatekeeper Defendants knew or recklessly disregarded that FCHL was then part of or highly likely to be part of a Microcap Pump-and-Dump Scheme. In part this was known because the Gatekeeper Defendants themselves repeatedly

contracted with companies that were involved in such pump-and-dumps, and in part it was known because FCHL had all the characteristics of companies that were so manipulated, including tiny revenue and income, a dominant controlling shareholder and an extremely low public float that rendered the Company highly susceptible to a squeeze.

200. Given their repeated involvement in prior Microcap Pump-and-Dump Schemes, the Gatekeeper Defendants either knew that FCHL would be the subject of a serious fraud or they recklessly disregarded that fact. As such, the Gatekeeper Defendants either knew that the Registration Statement contained materially false and misleading statements and omissions or they turned a blind eye to the defects in the Registration Statemen.

### B. The Acceleration of the IPO to Avoid the Nasdaq's Moves to Stop Pump-and Dump Schemes Demonstrates Scienter

201. On September 4, 2025, Nasdaq filed two proposed rules with the SEC: (i) a proposed rule requiring China-based issuers to raise at least $25 million to list, expressly because their small offering sizes, public floats, and ties to China made them susceptible to manipulation; and (ii) a proposed rule increasing to $15 million the minimum market value of public float applicable to new listings on Nasdaq under the net income standard. These proposed rules were among the many steps taken by U.S. regulators, law enforcement agencies, and self-regulatory organizations (such as Nasdaq and FINRA) to combat Microcap Pump-and-Dump Schemes like the one that soon thereafter damaged FCHL investors. The fact that FCHL, Lee, and Bancroft asked the SEC to accelerate the effectiveness of the Registration Statement, while omitting to mention the existence or implications of these steps taken by regulators, law enforcement agencies, and self-regulatory organizations, bolsters the inference that the Defendants intended to facilitate a Microcap Pump-and-Dump Scheme.

### C. <u>Defendant Teoh's Resignation Bolsters the Inference of Scienter</u>

202. Defendant Teoh, who joined the Company only in January 2024, resigned at some point in 2025 after the IPO. The fact that Teoh left the Company so soon after the collapse of the Company's stock price bolsters the inference of scienter. Further, Teoh's resignation at some unspecified point in 2025 was not disclosed until February 12, 2026, and no reason for her resignation was provided. These facts establish that her resignation was unusual and suspicious, bolstering an inference of scienter.

### D. <u>Defendant Lee's History of Paying Coaches' Fees in Cash Bolsters the Inference of Scienter</u>

203. The Registration Statement disclosed that:

> *Historically, Ms. Lee made salary payments, coaches' fees, independent contractor fees and company expenses directly to minimize bank transaction fees. The Company transferred the funds to Ms. Lee and Ms. Lee paid these amounts directly*. The Company ceased this practice from December 2023 for payment of coach fee and salary paid on behalf by Joyce Lee Jui Hui.

204. The fact that Defendant Lee paid each coach their fees directly, and personally, further establishes her awareness of the amount of such fees, and reflects the fact that she was personally involved in the day-to-day operations of the Company and thus was aware of the information misrepresented to investors. This bolsters the inference of scienter.

### E. <u>No Safe Harbor</u>

205. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements were all made in connection with an initial public offering, and therefore the safe harbor does not apply. Further, the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified

as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements and, further, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FCHL who knew that the statement was false when made.

## X. LOSS CAUSATION

206. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

207. During the Class Period, Plaintiffs and the Class purchased FCHL's securities at artificially inflated prices and were damaged thereby. The price of FCHL's ordinary shares has declined over 99% from its $4 per share IPO price, wiping out investors' investment.

## XI. CLASS ACTION ALLEGATIONS

208. Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that: (1) purchased or otherwise acquired FCHL's ordinary shares pursuant or traceable to the Registration Statement, seeking to pursue remedies under Sections 11 and 15 of the Securities Act; and/or (2) purchased or otherwise acquired FCHL's ordinary shares between September 3, 2025 and September 23, 2025, both dates inclusive, on the Nasdaq or another U.S. trading venue, seeking to pursue remedies under Sections 10(b), 20(a), and 20A of the Exchange Act. Excluded are Defendants herein, former and current officers, senior managers, and directors of FCHL, any entity in which any of the Defendants (alone or in combination with other Defendants) has or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

209. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. During the short Class Period, average daily trading volume was 14 thousand shares. The average trading volume and turnover create a strong presumption in favor of market efficiency. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

210. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

211. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

212. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Registration Statement contained material misrepresentations or omissions;
- whether the Individual Defendants, Bancroft, Onestop, or Cogency Global have a viable good faith defense to the strict liability otherwise imposed by Section 11 of the Securities Act;

- whether the Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;
- whether Individual Defendants were controlling persons of the Company;
- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- (for the Exchange Act claims only) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;
- (for the Exchange Act claims only) whether the Class has sustained damages and, if so, what is the proper measure of damages;
- (for Exchange Act claims only) whether the misrepresentations or omissions in the Registration Statement were made with scienter; and
- (for Exchange Act claims only) whether the losses of Plaintiffs and other investors were caused by the material misrepresentations and omissions in the Registration Statement.

213. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

214. With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- the Company's securities traded in an efficient market;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the Nasdaq;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

215. Based upon the foregoing, and because the alleged manipulative conduct affected equally the price of all listed shares, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

216. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act claims herein are based primarily on Defendants' omission of material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII. COUNTS

### COUNT I

### For Violations of Section 11 of the Securities Act Against All Defendants

217. Plaintiffs repeat and reallege allegations of ¶¶1-193 and 206-216 as if fully set forth herein except for the allegations related only to the Exchange Act claims identified in ¶¶194-205.

218. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

219. This claim is asserted by Plaintiffs against all Defendants on behalf of all persons who purchased shares of the Company's ordinary shares pursuant to and/or traceable to the Company's IPO, in which the shares registered under the Registration Statement were sold.

220. The Individual Defendants identified under this Count are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in ¶¶121-164 above.

221. FCHL is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in ¶¶121-164 above.

222. None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement, identified in ¶¶121-164 above, were true, were without omissions of material fact or were otherwise not misleading, or that the Registration Statement accurately identified all material facts that rendered an investment in the Company risky and all known risks, uncertainties, and adverse trends as required by Regulation S-K.

223. By reason of the conduct alleged herein, each of the Defendants named herein has violated Section 11 of the Securities Act.

224. All shares not registered by the Registration Statement and sold pursuant to the IPO Prospectus or the Resale Prospectus—each of which formed part of the Registration Statement—were subject to a lock-up agreement, and there is no evidence that any non-registered shares were (or even could have been) during the Class Period.

225. Plaintiffs and the Class have sustained damages because the price of their FCHL ordinary shares has declined precipitously. Their damages are attributable by law to Defendants in the absence of proof that the decline in value was caused by other factors, for which proof has not been established.

226. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this Action. The initial complaint was filed less than a year after the time that FCHL offered the shares covered by the Registration Statement to the investing public.

227. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**

**(Violations of Section 15 of the Securities Act Against Defendants Lee, Koh, and Teoh)**

228. Plaintiffs repeat and reallege allegations of ¶¶1-193 and 206-216 as if fully set forth herein except for the allegations related only to the Exchange Act claims identified in ¶¶194-205. The allegations contained in ¶¶194-205 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

229. Lee, by virtue of her office, directorship, and controlling interest in the Company, is a controlling person of the Company within the meaning of Section 15 of the Securities Act. As acknowledged in the Registration Statement, Lee "overs[aw] the strategic planning, operations, and management of Fitness Champs and Fitness Aquatics, and handle[d] the day-to-day operations and administrative work" of the Company. Further, Lee was in possession of material information that rendered the Registration Statement misleading.

230. Koh, by virtue of his office at the Company, is a controlling person of the Company within the meaning of Section 15 of the Securities Act. As acknowledged in the Registration Statement, Koh "overs[aw] . . . daily operations in each of [FCHL's] departments." Further, Koh was in possession of material information that rendered the Registration Statement misleading.

231. Teoh, by virtue of her office at the Company, was a controlling person of the Company within the meaning of Section 15 of the Securities Act. As acknowledged in the Registration Statement, Teoh was responsible for "financial reporting of [FCHL's] managing accounting operations;" "statutory financial audit reporting and coordinating corporate tax submissions;" and "preparation of budget and financial forecasts; and development and implementation of financial policies and procedures in business process."

232. By virtue of the conduct alleged herein, Lee, Koh, and Teoh are liable as control persons for the primary violations of Section 11 by the Company, as alleged in Count I. Each could have prevented the Company from employing the defective Registration Statement either by withholding signature or using their influence over the Company.

233. Lee, Koh, and Teoh did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and identified in ¶¶121-164 above were true, were without omissions of material fact, and were not misleading.

234. Each of these Defendants is liable to Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations committed by FCHL.

## COUNT III

## For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(a) and (c) Against Defendants Lee, Koh, Teoh, FCHL, and the Gatekeeper Defendants

235. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for the allegations contained in ¶¶125-132 and 163-164 to the extent they plead free-standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

236. During the Class Period, Lee, Koh, Teoh, FCHL, and the Gatekeeper Defendants employed devices and artifices to defraud, and carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) cause Plaintiffs and the other members of the Class to purchase FCHL's securities at an artificially inflated price. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants made the misleading statements alleged in ¶¶121-164, and engaged in additional unlawful acts as alleged herein.

237. Specifically, these Defendants employed devices, schemes, and artifices to defraud the Company's investors by conspiring together to take FCHL public under circumstances that would facilitate a Microcap Pump-and-Dump Scheme. Each of the Defendants engaged in numerous acts and practices in furtherance of the scheme, including: (a) agreeing to take FCHL public despite knowing that its profile and structure — a small, obscure business, minimal revenues, a dominant controlling shareholder, and a low public float of approximately 22% — matched the precise profile of issuers that had repeatedly been involved in Microcap Pump-and-Dump Schemes; (b) meeting and coordinating with one another in connection with the preparation of the defective Registration Statement, and taking the various steps necessary to prepare and issue it while omitting the known risks of the Microcap Pump-and-Dump Scheme; (c) in the case of the Gatekeeper Defendants, lending their names and services as gatekeepers to facilitate the Company's IPO; (d) in the case of Onestop, the Company, and Lee, asking the SEC to accelerate the effectiveness of the Registration Statement so that the IPO could be completed just before the scrutiny of U.S. regulators could disrupt the IPO; and (e) in the case of Defendant Lee, selling 1 million ordinary shares pursuant to the IPO Prospectus while in possession of material non-

publication information and in breached of a duty to abstain from trading or to disclose such information.

238. As a result of this fraudulent scheme and failure to disclose material facts, the value of FCHL's securities was artificially inflated during the Class Period and/or harmed by the Microcap Pump-and-Dump Scheme.

239. In ignorance of the fact that the value of FCHL's securities was artificially inflated and/or harmed by the scheme, Plaintiffs and the other members of the Class acquired securities during the Class Period at artificially high prices, and were damaged thereby.

240. At the time Lee, Koh, Teoh, FCHL, and the Gatekeeper Defendants orchestrated this fraudulent scheme, Plaintiffs and the other members of the Class were ignorant of its nature or existence. Had Plaintiffs and the other members of the Class known the truth about this unlawful scheme, they would not have purchased or otherwise acquired the securities of FCHL, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

241. As a direct and proximate result of the fraudulent scheme and misconduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of FCHL's securities during the Class Period.

242. By virtue of the foregoing, Lee, Koh, Teoh, FCHL, and the Gatekeeper Defendants thus violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

## COUNT IV

**For Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b) Against Defendants FCHL and the Individual Defendants**

243. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except for the allegations contained in ¶¶125-132 and 163-164 to the extent they plead free-standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

244. This Count is asserted against Defendants FCHL and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

245. At the time of the Registration Statement and during the Class Period, these Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the misstatements and omissions at least recklessly. Their misstatements were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FCHL securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire FCHL securities at artificially inflated prices.

246. Each of the Individual Defendants' primary liability and controlling-person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or

reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

247. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The material misrepresentations and/or omissions were made either knowingly or recklessly and for the purpose and effect of concealing or downplaying FCHL's significant vulnerability to an online pump-and-dump scheme and/or concealing the increased coaches' fees that FCHL began paying on January 1, 2025. If Defendants did not have actual knowledge of the misrepresentations and/or omissions alleged, they were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements were materially misleading when made.

248. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by

Defendants during the Class Period, Plaintiffs and the other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby.

249. In ignorance of the adverse facts concerning the Company's high risk to manipulation that was known or recklessly disregarded by the Defendants named in this Count, and which was concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired FCHL securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

250. During the Class Period, FCHL securities were traded on an active and efficient market. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of FCHL securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The value of FCHL securities has been nearly completely destroyed, to the injury of Plaintiffs and Class members.

251. By reason of the conduct alleged herein, FCHL and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

252. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period. FCHL and the Individual Defendants are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V

**For Violations of Section 20(a) of the Securities Exchange Act of 1934 Against the Individual Defendants**

253. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for the allegations contained in ¶¶125-132 and 163-164 to the extent they plead free-standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

254. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false and misleading statements.

255. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's risk disclosures, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

256. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of their direct communications with investors, which the Company disseminated in the marketplace during the Class Period concerning the Company's risk disclosures. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this

capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of the Company's securities.

257. The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, each of these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of these Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

258. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT V**

**For Violations of Section 20A of the Securities Exchange Act of 1934 Against Defendant Lee**

259. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for the allegations contained in ¶¶125-132 and 163-164 to the extent they plead free-standing claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

260. This Count is asserted on behalf of Plaintiffs and all members of the Class who purchased FCHL ordinary shares contemporaneously with Defendant Lee's sale of FCHL ordinary shares, as alleged herein.

261. Under § 20A of the 1934 Act, "[a]ny person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action . . . to any person who,

contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t-1(a).

262. At the time of FCHL's IPO, Defendant Lee was in possession of material nonpublic information regarding the matters misrepresented in the Registration Statement.

263. By virtue of possessing material non-public information, and due to his role as an insider at FCHL, Defendant Lee had a duty to disclose that information before trading on the basis of that information, or to abstain from trading. Defendant Lee also had a duty to not misappropriate that information by not using that information in conflict with the interests of FCHL's shareholders. Defendant Lee breached those duties by selling FCHL ordinary shares without disclosing the material nonpublic information, and misappropriated that information in order to sell FCHL ordinary shares.

264. In FCHL's IPO, pursuant to the IPO Prospectus, Defendant Lee sold 1 million of ordinary shares (through her wholly-owned company, Big Treasure) for proceeds of, according to the IPO Prospectus, $3.72 million.

265. Contemporaneously with Defendant Lee's sale of 1 million ordinary shares, Lead Plaintiff purchased FCHL stock as set forth in Lead Plaintiffs' previously-filed certification (ECF No. 24-3), including 4,424 ordinary shares at $4.45 per share on September 5, 2025.

266. Hundreds or even thousands of other Class members also purchased FCHL ordinary shares contemporaneously with Defendant Lee's insider sale of 1 million shares, as reflected by the fact that over 48,000 FCHL ordinary shares traded hands during its first six days of trading on the Nasdaq.

267. Defendant Lee is required to account for all such ordinary share sales and to disgorge any profits or ill-gotten gains.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

Dated: September 9, 2026

*/s/ Jonathan D. Park*
**POMERANTZ LLP**
Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jpark@pomlaw.com

*Counsel for Lead Plaintiff Ravikiran Toughtireddy and Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, 46th Floor
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Lead Plaintiff Ravikiran Toughtireddy*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ**
Benjamin Y. Kaufman
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
kaufman@wfafh.com
guiney@wfafh.com
donovan@wfafh.com

*Counsel for Additional Plaintiff Lim Yin Nee*